2020 IL App (1st) 181329-U

FOURTH DIVISION
May 7, 2020

No. 1-18-1329

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| WILLOW ELECTRICAL SUPPLY COMPANY, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No.    11 CH 5114 |
| | ) | Consolidated with |
| EULOGIO FLEITES a/k/a JOE FLEITES, KAROLINA | ) | 10 CH 41543 and |
| LJUBIC, GEMA FLEITES, individually and d/b/a | ) | 10 L 66042 |
| MIRACLE INVESTMENT GROUP, INC., d/b/a | ) | |
| MIRACLE INVESTMENTS, LLC and PROFESSIONAL | ) | |
| INSURANCE SERVICES, INC., MIRACLE | ) | |
| INVESTMENTS, LLC, d/b/a MIRACLE INVESTMENT | ) | Honorable |
| GROUP, INC., an Illinois limited liability company, | ) | Raymond W. Mitchell, |
| MIRACLE INVESTMENT GROUP, INC., a Nevada | ) | Judge Presiding. |
| Corporation, PROFESSIONAL INSURANCE | ) | |
| SERVICES, INC., an Illinois corporation, NEW | ) | |
| MILLENIUM BUILDING SYSTEMS, LLC, an Indiana | ) | |
| Limited liability company, and PROFESSIONAL | ) | |
| INSURANCE AGENCY, INC., and MIDWEST | ) | |
| SUPPLIERS, INC., | ) | |
| | ) | |
| Defendants-Appellees, | ) | |
| | ) | |
| (Illinois Concrete-I.C.I., Inc., and Walter Budz, | ) | |
| defendants). | ) | |
| _____ | ) | |
| | ) | |
| Great Northern Lumber, Inc., an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |

v.                                                    )
                                                      )
ILLINOIS CONCRETE - I.C.I., INC., an Illinois         )
corporation, WALTER P. BUDZ, individually and         )
d/b/a ILLINOIS CONCRETE- I.C.I., INC.,                )
JOE FLEITES a/k/a JOE CUBAN,                          )
individually and d/b/a ILLINOIS CONCRETE-             )
I.C.I, INC., KAROLINA LJUBIC, individually            )
and d/b/a ILLINOIS CONCRETE- I.C.I, INC.,             )
GEMA FLEITES, individually and d/b/a                  )
MIRACLE INVESTMENT GROUP, INC., d/b/a                 )
MIRACLE INVESTMENTS, LLC, and d/b/a                   )
PROFESSIONAL INSURANCE SERVICES, INC.,                )
MIRACLE INVESTMENTS, LLC, d/b/a                       )
MIRACLE INVESTMENT GROUP, INC., an                    )
Illinois limited liability company, MIRACLE           )
INVESTMENT GROUP, INC., a Nevada                      )
corporation, PROFESSIONAL INSURANCE                   )
SERVICES, INC., an Illinois corporation,              )
NEW MILLENIUM BUILDING SYSTEMS,                       )
LC, an Indiana limited liability company,             )
UNKNOWN OWNERS and NON-RECORD                         )
CLAIMANTS,                                            )
                                                      )
        Defendants.                                   )

JUSTICE BURKE delivered the judgment of the court.
Justice Reyes concurred in the judgment.
Presiding Justice Gordon dissented.

## ORDER

¶ 1    *Held*: We affirm the trial court's entry of judgment in favor of defendants following a bench trial and its denial of plaintiff's posttrial motion to reconsider. The trial court's determination that insufficient evidence was present to pierce the corporate veil was not against the manifest weight of the evidence and the trial court did not hold plaintiff to a heightened standard of proof.

¶ 2    Plaintiff, Willow Electrical Supply Company, Inc. (Willow), appeals the circuit court's

order following a bench trial entering judgment in favor of defendants in Willow's action to

recover the cost of electrical materials allegedly sold on credit to defendant Illinois Concrete,

Inc., (Illinois Concrete), but never paid for. On appeal, Willow contends that the trial court erred in (1) refusing to pierce the corporate veil of Illinois Concrete to hold other defendants liable, (2) denying its posttrial motion to reconsider, and (3) holding Willow to an improper standard in proving damages. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Willow is an electrical materials distributor with locations in Chicago and Schiller Park, Illinois, that provides electrical materials to construction contractors, frequently on credit. One such customer was Illinois Concrete, which initially was granted a $15,000 credit limit by Willow. Illinois Concrete quickly maxed out its credit, made some payments, but failed to pay its remaining balance of $1,800. Willow suspended its account and Illinois Concrete took approximately two years to pay off this minimal balance in December 2010. According to the president of Willow, Wieslaw Wardzala, Illinois Concrete then approached him on December 7, 2010, to request a larger extension of credit because of new construction projects, including the Rivers Casino in Des Plaines. According to Willow, between that date and January 17, 2011, Illinois Concrete purchased $389,712.04 worth of electrical materials on credit. Illinois Concrete issued a check for $85,000 to Willow on January 7, 2011, but later contacted Willow to request that the check not be deposited and indicated that a larger check would be delivered in its place. Illinois Concrete delivered a check for $125,000 on January 14, 2011, but a "stop payment" order was later placed on the check. Willow never ultimately received payment for the materials.

¶ 5        On February 9, 2011, Willow filed its initial four-count complaint against Illinois Concrete and its alleged owner and president, Walter Budz, in Case No. 11 CH 5114.[1] In count I,

---

[1] We note that Willow's case was ultimately consolidated with other cases that were initiated before Willow's lawsuit. Great Northern Lumber, Inc., brought an action against Illinois Concrete (Case Nos. 10 CH 41543 and 10 L 66042) related to the sale of lumber to Illinois Concrete for which Great Northern was not paid. Eventually, a settlement was reached in the Great Northern actions. Southfield Corporation d/b/a Illinois Brick

Willow asserted breach of contract regarding the materials purchased on credit between December 7, 2010, and January 17, 2011, in the amount of $389,712.04, but never paid for. Willow alleged that Budz and another representative of Illinois Concrete, Karolina Ljubic, made representations regarding the two checks delivered to Willow such that Wardzala did not deposit the $85,000 check and then waited one week before attempting to deposit the $125,000 replacement check, at their request. Willow also alleged that Illinois Concrete was Budz's alter ego and its corporate form should be disregarded. In count II, Willow asserted vexatious delay. In count III, Willow asserted a claim for replevin of the electrical materials. In count IV, Willow argued for prejudgment attachment against Illinois Concrete's bank accounts and Budz's real property at 8500 Hillcrest Drive in Orland Park.

¶ 6    On April 12, 2011, Willow filed a first amended complaint adding two new defendants: Ljubic and another representative of Illinois Concrete, Eulogio Fleites (who also went by Joe Fleites and Joe Cuban). The first amended complaint contained five counts, with counts I-III being the same as in the initial complaint. The amended complaint added count IV, which alleged common law fraud against Budz, Ljubic, and Eulogio in that they intended for Willow to rely on the two checks from Illinois Concrete in order to obtain more electrical materials on credit, knowing that Illinois Concrete lacked sufficient funds. Willow alleged that Eulogio called Willow and falsely identified himself as Budz and asked that he be allowed to replace the first check with a check of a higher amount, and later asked that the second check not be deposited until the following week. In count V, Willow alleged civil conspiracy against Budz, Eulogio, and Ljubic premised on similar allegations, *i.e.*, conspiring to use Illinois Concrete to obtain construction materials, knowing that Illinois Concrete did not have sufficient funds.

(Illinois Brick) also brought a claim against Budz and Illinois Concrete in Case No. 2010 L 13381 related to their failure to pay for brick and masonry materials and obtained a default judgment against them on March 1, 2011, in the amount of $124,886.70. Illinois Brick later filed a counterclaim to collect the judgment.

¶ 7        After the trial court found that it had jurisdiction over Budz and Illinois Concrete, Budz was held in default on July 19, 2011, and that Illinois Concrete was held in default on June 24, 2011, for their failure to appear, answer or plead in this matter. On January 12, 2012, the trial court entered a default judgment against Budz and Illinois Concrete in the amount of $389,712.04. The default judgment stated that Willow filed a five-count amended complaint and listed the counts as alleged in Willow's first amended complaint. Following a hearing on Willow's proof of damages, the trial court concluded that Willow demonstrated that it was damaged in the amount of $389,712.04 in delivering this amount worth of materials to Illinois Concrete and Budz.

¶ 8        Willow filed a second amended complaint on August 27, 2012, containing eight counts and adding as defendants Gema Fleites (Eulogio's wife) and various entities allegedly owned or controlled by her—Professional Insurance Services, Inc. (PISI), and Miracle Investment Group, Inc., and Miracle Investments, LLC., an Illinois limited liability company (together, the Miracle defendants); two entities alleged owned by Eulogio—Midwest Suppliers, Inc. (Midwest) and American Fire and Casualty Co., NM (American Fire); and Gema's father, Roberto Padron.

¶ 9        Defendants Gema, PISI, the Miracle defendants, Ljubic, Eulogio, and American Fire filed appearances and answers to the second amended complaint. Willow filed a petition for prejudgment attachment related to count VI and the four parcels of real estate owned by defendants. Defendants filed a response to the petition and a motion to dismiss count VI of the complaint related to the prejudgment attachment issue. Upon Willow's motion, Padron was voluntarily dismissed from the action.

¶ 10        Midwest filed an emergency motion for substitution of judge. The trial court denied the motion. Upon Willow's motion, the trial court entered an order of default against Midwest. On

November 8, 2013, the trial court entered a default judgment against Midwest in the amount of $389,712.04. Midwest filed an appeal. On appeal, this court reversed the trial court's order denying Midwest's motion for substitution of judge and all subsequent orders, including the order of default and default judgment of $389,712.04 entered against Midwest.[2]

¶ 11    On October 22, 2015, Willow filed a third amended complaint against Illinois Concrete, Budz, Eulogio, Gema, Ljubic, the Miracle defendants, PISI, Professional Insurance Agency, Inc. (PIAI), and Midwest. Similar to its allegations in previous complaints, in count I, Willow alleged that the court should pierce the corporate veil of Illinois Concrete to hold Eulogio, Gema, and Ljubic liable for the $389,712.04 default judgment entered against Budz and Illinois Concrete. Willow alleged that between December 7, 2010, and January 17, 2011, Illinois Concrete, through its agents Budz, Eulogio, Gema, and Ljubic, purchased on credit and received $389,712.04 worth of electrical materials, but breached its obligation to pay Willow for the materials. Further, Willow alleged that Gema and Eulogio owned and controlled PISI which financed Illinois Concrete as a shell entity by diverting money through the bank account of another shell entity, American Fire. Willow alleged that Gema, Eulogio, and Ljubic delivered the two checks for $85,000 and $125,000 purportedly signed by Budz to Willow, knowing that Illinois Concrete's bank account contained insufficient funds, for the purpose of obtaining additional materials on credit from Willow without paying. Willow alleged that a man identifying himself as Budz called Willow and asked that the check not be deposited until the following week. Willow alleged that a "stop payment" order was issued on the check by someone identifying himself as Budz to the bank that day.

---

[2] *Willow Electrical Supply Co., Inc. v. Midwest Suppliers, Inc.*, 2016 IL App (1st) 133848-U.

¶ 12    In court II, Willow alleged common law fraud against Eulogio, Gema, and Ljubic based on substantially similar factual allegations as in count I. In count III, Willow alleged a civil conspiracy between Eulogio, Gema, and Ljubic, relying largely on the same set of facts. In count IV, Willow argued that the court should pierce the corporate veil of Midwest and that Eulogio and Gema should be held liable for the $389,712.04 default judgment entered against Midwest on October 4, 2013. In count V,[3] Willow alleged that the court should pierce the corporate veils of PISI and the Miracle defendants because they were used by Eulogio and Gema to divert and commingle funds between those entities and Illinois Concrete and Midwest and purchase real estate or personal property for their own benefit. In count VI, Willow again requested that prejudgment attachment be entered against the four real estate parcels owned by Gema: (1) 6234 North Lenox Avenue, (2) 6236 North Lenox Avenue, (3) 5656 North Major Avenue, and (4) 2435-2451 West 14th Street, in Chicago.[4] In count VII, Willow alleged promissory fraud by Eulogio, Gema, and Ljubic in presenting Willow with the $125,000 check. In count VIII, Willow alleged successor liability against PIAI in that Gema changed the name of PISI to PIAI in order to escape liabilities against PISI.

¶ 13    On May 3, 2017, the case proceeded to a two-week bench trial on Willow's third amended complaint.

¶ 14    At trial, Wardzala testified that he is president of Willow, an electrical supply distribution company he formed in 1994. Wardzala testified that electrical contractors frequently rely on purchasing electrical supplies on credit. Illinois Concrete submitted a credit application in February 2009, signed by Budz, and listed three credit references and provided a certificate of

---

[3] We note that the third amended complaint erroneously titled this count IV, but the trial court later entered an order correcting the numbering of the counts.

[4] We note that the trial court ordered defendants not to answer count VI based on the petition for prejudgment attachment already pending.

registration from the Secretary of State. Illinois Concrete listed its address as 3525 West Peterson, Suite 601, in Chicago. Wardzala testified that one credit reference, J&J Express, stated that Illinois Concrete was an excellent paying customer. Wardzala later learned this was Ljubic's trucking company or a company she worked for. Wardzala testified that Willow granted Illinois Concrete a $15,000 credit line in February 2009, which Illinois concrete exhausted by May 2009. Illinois Concrete made payments in May, June, and August of 2009, and then Willow suspended its account for failure to make payments. Illinois Concrete made another payment in February 2010, and then finally paid off the remaining $1,800 balance on December 7, 2010.

¶ 15        Wardzala testified that also on December 7, 2010, Ljubic came to Willow in person and explained to Wardzala that Illinois Concrete had fallen on hard times, like other construction companies during the recession. Ljubic informed him that Illinois Concrete had recently secured multiple projects, including working on the Rivers Casino in Des Plaines. Wardzala approved reinstatement and an increase of Illinois Concrete's credit to approximately $390,000. Wardzala testified that he believed that he spoke to Budz over the phone around the time of the December 7, 2010, increase, but he later came to believe that he was actually speaking to Eulogio.

¶ 16        Wardzala explained that Willow generates statements on the 24th of each month, with payment due in 30 days, and applies a discount if paid earlier. Reviewing Illinois Concrete's invoices from December 7, 2010, through January 26, 2011, Wardzala testified that as of January 27, 2011, Illinois Concrete owed a total of $389,712.04. Wardzala testified that a statement generated on February 9, 2011, showed the amounts due from different time periods. It showed that from December 7 to December 24, 2010, a total of $98,084.47 in purchases were charged to the account. From December 25, 2010, to January 26, 2011, Illinois Concrete purchased $291,627.57 worth of materials from Willow on credit. He indicated that credit purchases of

$7,380.08 and $6,298.49 occurred on January 24, 2011, and a credit purchase of $14,760.15 occurred on January 26, 2011.

¶ 17    Wardzala testified that on January 7, 2011, Illinois Concrete gave Willow a check for $85,000 signed by Budz, and in the memo line it was written: "Monthly payment." However, Wardzala testified that Ljubic called and asked Wardzala to wait a few days before depositing the check because there were insufficient funds. Wardzala never deposited the check and returned it to Ljubic. In exchange, on January 14, 2011, Ljubic delivered a check for $125,000 also signed by Budz. The memo line included the account number and the notation "account current." Wardzala testified that Illinois Concrete's account would have been current had the check been honored. However, the $125,000 check was not honored because a "stop payment" order was issued. Wardzala agreed that four days after the stop payment was issued on the $125,000 check, Willow extended an additional $28,000 in credit purchases. Wardzala called Illinois Concrete and spoke to someone who identified himself as Budz, but Wardzala later came to believe that it was Eulogio because Budz has a heavy Eastern European accent. Wardzala was told that a replacement check would be issued, but never received payment.

¶ 18    Wardzala testified that most of the materials ordered by Illinois Concrete were picked up at Willow's warehouse, and Wardzala observed Ljubic and Eulogio there multiple times. Wardzala testified that Eulogio wore a ski mask when he picked up materials and told Wardzala he was sick. Wardzala testified that he never spoke with Gema and she never picked up any materials. Wardzala testified that some of the materials ordered by Illinois Concrete were for specific projects, such as the construction of Rivers Casino in Des Plaines, where Willow delivered large quantities of high base light fixtures. Wardzala testified that Illinois Concrete also received two Generac generators from Willow. Wardzala testified that he later discovered that

the two generators had been resold on Ebay by Midwest. Wardzala testified that in December 2013, the Chicago Police Department contacted him and directed him to a storage yard in Evanston, where he identified some of the electrical materials that Willow had sold to Illinois Concrete. Wardzala testified that the materials were in the same condition as when they were sold. Willow eventually scrapped the materials.[5]

¶ 19     Ljubic testified that she signed the articles of amendment changing the name of the company Tatra Builders, which was owned by Budz, to Illinois Concrete in 2008. Ljubic testified that Budz was president of Illinois Concrete and he decided to use the 3525 West Peterson address for Illinois Concrete. Ljubic testified that while employed by Illinois Concrete, she was responsible for payroll, writing checks, making deposits, marketing, visiting project sites, and meeting customers. She and Eulogio were signatories on its bank accounts. She received wages from Illinois Concrete and Eulogio received a commission. She testified that Illinois Concrete was the general contractor for two homes on Lenox Avenue. Ljubic believed that a man named Romi Andras later became president of Illinois Concrete, but she never met him.

¶ 20     Ljubic recalled going to Willow in late 2009 to meet with Wardzala about re-establishing Illinois Concrete's line of credit. She testified that J&J Express was a trucking company that was owned by her father, but it was no longer in business. She did not recall Eulogio executing a document listing J&J Express as a credit reference for Illinois Concrete. She placed orders with Willow. She testified that she had no recollection of Illinois Concrete having a construction project with the Rivers Casino. Ljubic testified that she did not recall writing checks for $85,000 or $125,000.

---

[5] The record reflects that in December 2013, Willow filed a motion for turnover of electrical supplies that were recovered by the Chicago Police Department from Illinois Concrete. The trial court granted the motion and ordered Willow to sequester the materials for valuation.

¶ 21    During her testimony, Ljubic was presented with numerous checks from Illinois Concrete and other entities that were admitted into evidence. She testified that she did not have any first-hand knowledge regarding any money that flowed between Illinois Concrete, Midwest, and American Fire, and her testimony was based on viewing the memo lines of the checks and not from her own memory. She could not specifically remember what each check was written for, as they were from almost ten years before trial. Ljubic identified her signature on a check for $15,350 for a 1997 truck issued by Illinois Concrete to American Fire on February 8, 2008. Ljubic testified that the truck was used by Illinois Concrete for the work it did. She also identified a check from Illinois Concrete to American Fire for $20,000 which contained the notation, "loan reimbursement," but Ljubic did not know anything about such a loan. She testified that another check indicated it was for reimbursing Eulogio for "TCOB" according to the memo line, which Ljubic testified was for work performed by Illinois Concrete in Michigan. She testified that a check for $20,000 with the notation, "draw on Lakeshore Hospitality," could have been payment for a contractor. She testified that even if a check was for "a draw," it could mean it was intended to pay a contractor and not necessarily a draw for an owner. Ljubic testified that the checks which she received cash for herself were for reimbursement for purchasing construction or office supplies. She testified that she never took any money other than her own salary and reimbursements for expenses.

¶ 22    Regarding the checks that she cashed where the memo lines referred to Eulogio or Budz, Ljubic testified that she often would do this if they needed to be reimbursed for something or if they needed to pay a contractor, because contractors preferred to be paid in cash and would often charge less if they were paid in cash. The majority of contractors were paid in cash. If she was asked to write a check and bring cash back, that is what she did. She testified that the memo line

usually indicated which property or project the check was related to. She testified that there were huge binders of receipts relating to the payments, but she did not have them and did not know what happened to them. To her knowledge, Eulogio was not paid any money other than for appropriate reimbursements and for work that he performed.

¶ 23    Ljubic testified that she also did limited bookkeeping for Midwest, but she was not an owner or officer. She testified that Midwest once resold a load of vodka, even though it did not have a liquor license, because her husband had transported the load of vodka and it was not paid for or had been damaged. Midwest also sold diesel fuel to Ravenswood Disposal, but she did not know where the fuel came from. She testified that she was not familiar with the two Generac generators that Willow sold to Illinois Concrete. Ljubic affirmed that she assisted in filing documents to incorporate a Michigan corporation named Black Diamond Concrete. She listed Tom Gentry as the registered agent and Budz as the incorporator. She spoke to Gentry several times because he called to inform her that Black Diamond Concrete had received mail. She testified that she did not know the purpose of Black Diamond Concrete.

¶ 24    Gema testified that she was the president of PISI, which her husband Eulogio formed in 1987 and she took over in 2012. Gloria Bailey and Shankar Chaudhari also worked for PISI. Gema testified that Chaudhari was a surplus lines producer; PISI paid for his license in 2004, enabling him to issue non-standard policies. She testified that she did not have any records for PISI because either Eulogio had them or Chaudhari took them when he left the company. Gema acknowledged that she sold a high-risk non-standard insurance policy to Princess Foods, which was necessary because it was a bad risk and could not obtain a standard insurance policy.

¶ 25    Gema testified that PISI's address has been 3525 West Peterson Avenue since 1991. She testified that in 2010 or 2011, she became aware that Budz was using that address personally or

professionally. She informed Eulogio, who stated he would speak with Budz about it. She also tried to call Budz and wrote him a letter. She testified that Illinois Concrete's office was located at Devon and Pulaski.

¶ 26    She testified that Eulogio was previously an insurance agent and started doing construction work on a self-employed basis. He has worked as a general contractor on several real estate projects that she purchased; she has always paid him for his work and the work of his companies. Regarding the Lenox property, Gema testified that Eulogio found out it was for sale and it seemed like a good investment property. She testified that he is otherwise not involved in her business. In the past, she provided financial assistance to him if he needed it for a project, but she was otherwise not involved in any decision making or control over his work and she expected to be repaid.

¶ 27    Gema testified that Eulogio owns American Fire. Gema testified that the Illinois Department of Insurance requested that American Fire cease and desist operating in 2013. American Fire did not defend against the proceedings as it had ceased operating in 2011. She testified that she was not involved with American Fire. She acknowledged that a cease and desist order was entered against her, her father, Eulogio, and American Fire, and that the hearing officer found that she and Eulogio engaged in the business of insurance on behalf of American Fire without a certificate of authority. She testified that there was nothing in the cease and desist order that would impact her as an insurance agent or PISI.

¶ 28    She identified records at trial showing that PISI paid the telephone bills for American Fire between 2006 and 2011; she testified that Eulogio or Chaudhari gave her the bills and told her to pay them and she did not question why. She acknowledged that her husband purchased her a Mercedes vehicle using money from American Fire's account. She used PISI operating account

money to pay for the license renewal fee on the car. She identified several checks from PISI's premium trust account to American Fire. She testified that she issued these checks based on Chaudhari's instructions. She also identified a deposit slip showing she wrote a check from her account to American Fire for $28,500, but she did not recall why she wrote the check. She testified that a check for $19,936.80 in 2006 to American Fire from PISI was for insurance premium payments to American Fire. Another check for $28,559.20 in 2006 to American Fire was also for insurance premiums. She testified that the only items which came out of PISI's premium fund trust account were for payments to insurance companies and commissions. Gema testified that the checks from PISI to American Fire were for premiums due to American Fire. Gema testified that prior to this litigation, she had never heard of Willow, DeGroate Petroleum, Illinois Brick, or that Eulogio tried to sell diesel fuel. She testified that she was not part of an enterprise or conspiracy to defraud anyone.

¶ 29    Eulogio testified that he was the principal and owner of American Fire, which he incorporated in Aruba in order to underwrite high risks. He testified that Shankar's duties including underwriting policies and countersigning surplus lines insurance policies for American Fire. He testified that he purchased a truck for himself and paid for it with American Fire funds, but he may have paid American Fire back. He testified that the law firm of Condon & Cook handled insurance defense cases for American Fire, which is why bank records showed that there were payments made from American Fire to that firm. Regarding a $20,000 payment by Illinois Concrete to American Fire, Eulogio testified that he did not know what the payment was for. He testified there were no loan documents between Illinois Concrete and American Fire regarding that payment, or any documentation regarding the purchase of a truck.

¶ 30    Eulogio testified that Black Diamond Concrete was a corporation formed in Michigan to develop a 60-acre lot into a resort, but the project never materialized beyond digging a pond. Ljubic handled the incorporation of Black Diamond Concrete. The entity TCOB was formed in Michigan to own the property. Eulogio acknowledged a certificate of title to a 2007 Dodge truck that he signed as president of Black Diamond Concrete, but he testified that he did not think he was ever president and he believed Budz was president. Eulogio also acknowledged there was a certificate of title showing that he sold a 2001 Ford truck on behalf of Black Diamond Concrete. In addition, Eulogio also owned ABR Contractors (ABR), his sole proprietorship through which he handled small remodeling projects. He also owned Brad Contractors, which handled general contracting for projects.

¶ 31    Eulogio testified that he first met Budz 15 or 20 years ago, when Budz was framing in a house in his neighborhood. Budz later asked him to provide marketing and sales services for his business, which was called Tatra Builders at the time. Ljubic changed the name to Illinois Concrete for Budz. Eulogio testified that he began working for Illinois Concrete in 2004 or 2005, until at least 2011, and Budz was his boss and the owner. Illinois Concrete's office was located at 4001 West Devon Avenue in Chicago. Eulogio testified that Budz never worked out of the office on Peterson. Eulogio testified that J&J Express was a trucking company owned by Ljubic's family and he did not ask Ljubic for a credit reference from J&J for Illinois Concrete's credit application to Willow.

¶ 32    In addition to marketing and sales services, Eulogio also provided some manual labor and project management for Illinois Concrete. Eulogio testified that he brought in large projects for Budz, such as townhomes or dealership construction projects. Some clients came through his insurance business. He received a commission based on the amount of the contract between

Illinois Concrete and the client. He testified that no commissions went through his wife and she did not have anything to do with the construction. Illinois Concrete also did insurance claim rehabilitation work through American Fire. Eulogio testified that a fire occurred at Princess Foods, which had insurance through American Fire. He rehabilitated the building with Illinois Concrete acting as general contractor because he could rebuild it for much less ($60,000-$80,000) than the estimate received by a public adjuster ($200,000).

¶ 33      Eulogio testified that Illinois Concrete's bank records and checks showed that various checks that were written to him from Illinois Concrete because he often paid for materials or other supplies himself and Illinois Concrete reimbursed him. Thus, checks written to "Joe Fleites – cash" were payments to him or meant for him to make cash payments to a subcontractor or vendor. He testified that the checks originally had stubs attached which contained information about the payment, but the stubs were detached before depositing.

¶ 34      Eulogio testified that Budz directed that Illinois Concrete order materials from Willow. Eulogio never placed orders or received deliveries from Willow. Eulogio did not personally go to Willow to pick up materials and he never went to Willow while wearing a ski mask. Eulogio testified that he did not know anything about the purchase of electrical supplies between December 2009 and January 2010. He testified that Budz instructed Ljubic to make a payment to Willow.

¶ 35      Eulogio testified that he had no knowledge about electrical materials that were found at the storage facility on Oakton in Evanston. Eulogio testified that he rented the space at Oakton to keep his equipment there. He allowed Budz to store materials there, but Eulogio was not involved in storing any Illinois Concrete materials there. He testified that Budz took it over in

2009 and rented it under the name of Illinois Concrete. He testified that Budz wanted a lot on the north side of Chicago to store equipment.

¶ 36     Eulogio testified that the only materials ordered from Willow that he knew about were two Generac generators. Budz put the two generators on Eulogio's pickup truck and instructed Eulogio to sell them. He believed the generators belonged to Budz because they were in his possession. Eulogio sold the generators on Ebay and gave Budz the proceeds but kept some of the money because Illinois Concrete owed him money. Eulogio testified that he sold the generators through his other business, Midwest, because that is the business he used to access Ebay and sell excess materials.

¶ 37     Eulogio testified that the Lenox property was purchased in 2005. Initially, he and Budz planned that it would be a joint project, but Budz later backed out when they could not agree on the terms. Eulogio testified that this is why Budz's name appeared on the initial documents relating to the sale, but Gema was ultimately the buyer on the deed. Illinois Concrete was the general contractor at the Lenox property. Budz poured the foundation. Midwest was also involved in working on the Lenox project. Eulogio was in charge of that project and another project on 14th Street.

¶ 38     With regard to the diesel fuel, Eulogio testified that Budz placed 23 tote containers of diesel at a storage facility located on 14th Street without his permission. Eulogio testified that Budz "would always put materials there" and he had a substantial amount of lumber for future projects stored there. Eulogio testified that Budz asked Eulogio to sell the excess fuel for him because Eulogio insured a lot of transportation companies. Eulogio sold the diesel to a friend at Ravenswood Disposal. He placed the funds from the sale into Midwest's bank account. Eulogio testified that Budz signed a truck over to him and Brad Contractors in September 2012 because

Budz owed Gema a substantial amount of rent money for the equipment and construction materials that Budz had been storing at the 14th Street location. Additionally, Eulogio testified that he once assisted Ljubic move a load of vodka and helped sell it to some business owners that Eulogio knew.

¶ 39    Eulogio testified that Gema had nothing to do with ABR, Illinois Concrete, Brad Contractors, American Fire, Black Diamond Concrete, or the Michigan property. Eulogio testified that he purchased a Mercedes vehicle through American Fire for his wife to compensate her for the work she did with PISI. Eulogio testified that Andras eventually took over Illinois Concrete, but Eulogio has never met him and did not know when he took over.

¶ 40    Budz testified that he used to live on Hillcrest in Orland Park, Illinois. Budz conceded that he was served individually and as president of Illinois Concrete with the complaint in this case on or around February 26, 2011, according to the service documents, and that a judgment of $389,712.04 was entered against him. Budz testified that he declared bankruptcy, which proceeded until approximately the month before this trial.[6] Budz testified that he only appeared in court once in this case and refused to answer questions in court without an attorney present. Budz testified that he met with Willow's counsel four times before trial, each meeting was three to four hours.

¶ 41    Budz testified that in 2004 or 2005, he was working through Tatra Builders and met Eulogio and did some rough carpentry work for him. Budz testified that it was Eulogio's idea to run Illinois Concrete together; Budz was president and did the manual work while Eulogio brought in business and managed construction jobs. Budz testified that he was president of

---

[6] We note that the record reflects that trial court entered an order dismissing a citation to discover assets against Budz on November 5, 2013, because he had filed for bankruptcy.

Illinois Concrete during 2008 and 2009, and also for some time before and after that. Budz testified that he was originally from Poland and had high school education; he relied on Eulogio and Ljubic to handle bookkeeping, taxes, and the financial aspects of the business. Budz testified that he relied on Eulogio and Ljubic to prepare, execute, and read contracts for Illinois Concrete, and he would sign them if required. Budz testified that he never examined the books and records of Illinois Concrete in 2008 or 2009.

¶ 42    Budz testified that he did not order materials; Eulogio handled this. Budz testified that the first time he became aware that Illinois Concrete ordered materials from Willow was when he was served with the lawsuit at his home. Budz testified that the signatures on the $85,000 check and the $125,000 check from Illinois Concrete to Willow were not his and he did not write it or authorize it. He also was never contacted by Ljubic or Eulogio about these outstanding bills or asked to place a stop payment order on the $125,000 check. He testified that he had no connection to Illinois Concrete in December 2010 and January 2011.

¶ 43    Budz testified that Illinois Concrete paid him by check or cash. He received owner's draws of $800 to $1200 for projects. Budz was shown the same numerous checks as Eulogio and Ljubic written from Illinois Concrete. Budz testified that some checks had his signature or identification number, but he did not authorize them. He testified that most of the checks he viewed, he did not know what they were specifically for, did not authorize them, or they concerned matters that would have been handled by Eulogio or Ljubic. This included a check for $20,000 to American Fire which indicated it was a loan reimbursement, of which Budz testified he had no knowledge; a check to Eulogio related to the "McHenry" project and a mechanic's lien; a $5,000 check to Eulogio, which Budz indicated may have been for materials; a check for the "commission on 526 West Deming Place," but Budz did not recall a project at that location; a

check for expense reimbursement for a house on 211 Shirley in McHenry; a check to Eulogio or cash for $2,400 for Art Masonry, which Budz was not familiar with; a check written to the City of Chicago regarding the Lenox property; a check for $10,000 which stated, "drawn on American Fire," but Budz did not know what this meant and did not authorize; a check related to a Ford Escape, which was Eulogio's vehicle; a check for $6,500 and a check for $14,000 for "Shanklins reimbursement"; a check for "D&D Concrete, LLC" for the Lenox property; a check to Ljubic or "to cash" for $10,000; a check to Eulogio or to cash for $8,100, a check for $5,000 written "to cash" for the Lenox property; a check to SUG Masonry for the 14th Street project, although Budz acknowledged that Eulogio hired SUG Masonry to perform masonry work at that site; a check to Eulogio or "to cash" for $4,656 for expenses; a check regarding Lakeshore Hospitality; two checks payable "to cash" indicating "expense reimbursement-Joe TCOB"; a check for $2,153 for expense reimbursement for TCOB taxes; and a check from Illinois Concrete to American Fire for $15,350 for the purchase of a tractor trailer. Budz also testified that a check for $6,010 to Ashland Mill could have been for windows at a commercial building project. Budz testified that there was a check for $10,000 which indicated it was a "withdraw on 8100 Central Park," which was Princess Foods. Budz testified that Illinois Concrete had no relationship to Princess Foods and did not do any work on it. Budz testified that Eulogio had Budz go to the burned building and advise him about how to repair it.

¶ 44    However, on cross-examination, Budz conceded that with regard to the checks he reviewed, he did not know whether they were legitimate because he was not responsible for any payments during those years, and he was testifying as to what he was reading on the checks and did not have any independent recollection. Budz never made any claim that Eulogio or Ljubic embezzled from Illinois Concrete. Regarding the purchase of a truck, Budz testified that he and

Eulogio agreed to purchase one together, Eulogio would finance it and Budz would pay him monthly. Budz never paid Eulogio back, so he assumed that Eulogio owned the truck. Budz also claimed that he did not know the purpose of checks written to Miracle Investment for Ricardo Gutierrez, who was a mechanic for Illinois Concrete and worked at the construction site on the 14th Street project.

¶ 45       Budz testified that he had no connection to Midwest, and, to his knowledge, he was never a president, officer, agent, or member of it. He never possessed its corporate records or received compensation from Midwest. He maintained that he had nothing to do with the sale of the generators and did not ask Eulogio to sell them.

¶ 46       Budz initially testified that he had no relationship to Black Diamond Concrete. He later testified that he performed some work on the Michigan project in excavating a pond, but he was unaware of a corporation formed for that purpose. He had an oral agreement with Eulogio that he would be a partner or be reimbursed the work he put into it.

¶ 47       Regarding the storage of construction materials and fuel at the 14th Street location, Budz testified that he left machinery and construction materials at Eulogio's direction. Budz testified that he did not leave fuel there, he did not know what a fuel tote was, he never purchased 23 fuel totes, he did not ask Eulogio to sell fuel, and he did not store fuel in fuel totes there. He testified that there was one liquid container tote on the lot, but it did not belong to him. He also testified that he did not authorize payment to Gema for rent to store construction materials at 14th Street, as he had a verbal agreement with Eulogio that Budz could store materials there, but that was the extent of it.

¶ 48    With respect to the storage facility on Oakton in Evanston, Budz testified that he sometimes went there because Eulogio had materials stored there, but Budz denied that he rented the space for Illinois Concrete.

¶ 49    Budz testified that he assisted in building the houses on Lenox, but he did not have any involvement in purchasing the property. He did not know his name was on the initial real estate contract until Willow's attorney showed him.

¶ 50    Budz testified that he informed Eulogio that he wanted to go out of business because there was no work available. Eulogio did not want to close Illinois Concrete, so Budz told him to "sign it over." Budz testified that Eulogio searched for a buyer and finally found Andras. Budz did not know who Andras was and he never had a written agreement with Andras or spoke to him about a sale. He never was paid any money for the sale of Illinois Concrete.

¶ 51    Mark Stringer testified that he owns 2523 Oakton in Evanston, which is vacant land that he rents out to contractors for storage. Stringer testified that the initial lease from 1999 listed ABR as the lessor, and the lease from 2012 listed Illinois Concrete. Stringer dealt primarily with Eulogio and also communicated with Ljubic.

¶ 52    Chaudhari testified that he worked for PISI at the office on Peterson from 1992 until 2001 or 2002, at the latest. He brought in quotes for insurance policies. He received a 50% commission for the business he brought in. At the Fleites' request, he obtained a surplus lines insurance license, and they paid him $50 for each surplus lines policy he signed. Chaudhari reviewed applications for surplus lines producer licenses from 2004, 2005, and 2008 submitted to the State, and testified that although his name and signature appeared on the documents, he no longer worked for the Fleites and he did not sign those documents. He testified that he was not aware that he was an authorized agent for American Fire and did not authorize the Fleites to sign

his name to documents related to American Fire. He testified that when he worked for the Fleites, they had a signature stamp made of his signature because he was not always present in the office to sign policies. He testified that he moved out of Illinois in 2004 and currently manages a convenience store in Alabama.

¶ 53    David Ocasek, chief executive officer of the Surplus Line Association of Illinois, testified that surplus lines producers must be licensed individually and they must file every surplus lines policy issued and money bearing endorsement with his organization. None of the policies produced by Chaudhari as surplus lines policies were filed with the association. Ocasek testified that in order for a surplus lines producer to use a particular unlicensed insurance company, the company has to meet certain criteria, including that the company is registered with rating agencies. Ocasek found no record of American Fire being registered with a rating agency.

¶ 54    The parties also submitted into evidence the deposition of Bailey, who testified that she believed Chaudhari had not worked in the PISI office since 2011. The parties submitted the deposition of Andras, who testified that he lives in Romania and has not lived in the United States since October 2008. Further, the parties submitted Gentry's deposition, who testified that he did not give anyone permission to use his name as the registered agent for Black Diamond Concrete.

¶ 55    Ellen Stawski testified that she works as the corporate credit manager for Illinois Brick, a brick and stone distributor. Illinois Concrete submitted a credit application in 2008 and listed J&J Express as a credit reference. Illinois Brick extended credit to Illinois Concrete and did business of approximately $30,000 in 2008 and 2009 and the bills were promptly paid. However, in September and October of 2010, Illinois Concrete placed several large orders totaling $115,000, but failed to pay for materials it ordered. Stawski testified that Illinois Concrete then

provided an invalid credit card number and never delivered a promised check for $62,000. Stawski spoke with Budz over the phone, who informed her that he was going to bring in payment. She also visited the address listed on the credit application, 3525 West Peterson, which was an office building, and the suite listed in the application corresponded to Miracle Investments. She also went to an address on Devon, but the office there was locked and there was an eviction notice. Illinois Brick filed suit and ultimately obtained a judgment for $115,000 against Illinois Concrete, the Fleites, Miracle Investments, Ljubic, American Fire, PISI, and Midwest. Illinois Brick also filed a lien against Budz's house and recovered funds from that.

¶ 56        Robert Huette testified that he is a general sales manager for Illinois Brick. In December 2013, he was contacted by a police detective and asked to go view stone materials at the storage lot on Oakton in Evanston. He identified 70 to 80 pallets of stone, approximately $60,000 to $65,000 worth, which Illinois Brick recovered.

¶ 57        Linda Stellwagen testified that when she was president of DeGroate Petroleum, Illinois Concrete began purchasing small amounts of red-dye fuel (which is used for construction machinery) in 2008 and started purchasing large quantities in December 2010 and January 2011. She explained that it is prohibited to resell dyed fuel because it requires a distributor license. Illinois Concrete's 2008 credit application listed its address as 3525 West Peterson and Stellwagen approved it for a small amount of credit. Payment issues arose in February and March of 2011. She testified that she spoke with someone who identified himself as Budz who stated that Illinois Concrete needed more fuel because of a "big job." When Illinois Concrete began ordering larger quantities of fuel, Stellwagen requested an updated credit application and a personal guarantee. The new credit application listed the address as 4001 West Devon Avenue and one of the credit references was J&J Express. In March 2011, two checks from Illinois

Concrete were returned due to insufficient funds. Stellwagen spoke with Budz over the phone, who explained that "Romi is trying to get the bank accounts straightened out" and promised her a check soon but she never received payment. Stellwagen later learned that Budz has an accent, and the person she spoke with was "a smooth talker" with no accent. She testified that Illinois Concrete owed $179,000 and DeGroate filed a lawsuit.

¶ 58        Branko Vardijan testified that he worked for Ravenswood Disposal and Illinois Concrete rented dumpsters for construction projects. Vardijan testified that he purchased diesel fuel from Illinois Concrete. Eulogio informed Vardijan that he had a lot of fuel at a very good price that he had purchased at auction. Vardijan testified that Eulogio brought the fuel in large plastic containers on a truck bed. Ljubic gave him an invoice for the fuel and asked him to write a check to Midwest. Vardijan testified that shortly after an attorney for DeGroate contacted him, Eulogio contacted him and wanted to change the invoices from fuel to equipment, but Vardijan refused.

¶ 59        Willow's expert forensic accounting witness, Michael Pakter, CPA, testified that he examined the checks, bank statements, credit card statements, deposit tickets, bank signature cards, and depositions at issue in this case, focusing on transactions between January 2005 and December 2014, with emphasis on December 2010 to early 2011. He concluded that Illinois Concrete, Midwest, PISI, American Fire, and ABR were related entities that were essentially operated as a single enterprise for the benefit of Eulogio and Gema, and to the detriment of Willow and other creditors. Pakter opined that the transactions between the entities, Gema, and Eulogio demonstrated a fraudulent purpose and an alter-ego relationship. Pakter found that other than PISI, the other entities had little to no capital or reserves. Pakter opined that the entities commingled their assets and money, operated out of the same office, and engaged in irregular transactions, such as transferring large volumes of cash between them, one entity paying

expenses of another entity, making undocumented loans to each other, and paying the same credit card.

¶ 60 Pakter highlighted such transactions as an Illinois Concrete check for $20,000 "described as a draw on Lakeshore Hospitality," which was a customer of PISI; an Illinois Concrete check for $10,000 from American Fire written "to cash"; a transfer of $150,000 from American Fire to Illinois Concrete; and ABR transferred money to Illinois Concrete. Pakter testified that the TCOB property project showed intent to deceive because the earnest money for the purchase came from Miracle Investment, an additional $135,000 came from American Fire, whose source of funds is PISI, and from an individual named Rohit Patel, who is PISI's largest customer. Further, Illinois Concrete paid for TCOB expenses and real estate taxes through payments to Eulogio and Patel. Pakter opined that Illinois Concrete transferred $22,000 to ABR and it paid over $100,000 on ABR's American Express credit card, without consideration. Pakter further testified that Illinois Concrete, Midwest, and ABR did not charge Gema for being the general contractors on her real estate projects. Pakter acknowledged that Gema paid $135,000 to Midwest, but he maintained that this was not indicia of Gema paying a general contractor, but of a related entity transferring money to another related entity. Additionally, American Fire financed the purchase of the Mercedes for Gema and Midwest paid for repairs of the vehicle. He noted that Illinois Concrete transferred over $4,000 to Miracle Investment, which paid the rent for an individual (Gutierrez) working on her real estate construction projects.

¶ 61 Pakter opined that Budz was held out as the owner of Illinois Concrete, but Eulogio exercised control over Illinois Concrete. Pakter found that Budz received small amounts of compensation, but there were indicia that Budz did not actually receive the money from larger checks from Illinois Concrete that were made out to "cash or Walter Budz" in amounts like

$12,000, $5,000, and $20,000. Pakter testified that Eulogio withdrew large amounts of cash from Illinois Concrete, received reimbursements from Illinois Concrete for non-Illinois Concrete expenses, and Illinois Concrete transferred money and assets without consideration to other entities owned by Eulogio, such as ABR and TCOB. Pakter observed that Illinois Concrete transferred $77,897 to Eulogio, including many checks payable to "cash or Joe" or characterized as an "owner's draw." Based on Andras' deposition that Pakter reviewed, Andras moved to Romania in 2008 and had never heard of Illinois Concrete. Pakter testified that Illinois Concrete had only minimal amounts in its bank account when it ordered $389,712 worth of materials from Willow. He did not consider in his analysis Illinois Concrete's prior poor credit history with Willow. He did not investigate whether $390,000 of material was actually ordered and delivered to Illinois Concrete from Willow. He only found that two generators from Willow were resold, totaling $26,753. Pakter also noted there were several large-dollar judgments entered against Illinois Concrete involving other companies.

¶ 62      Pakter testified that the insurance carrier American Fire lacked capital, revenue, or assets. It was funded by other entities and individuals: over $800,000 from PISI, over $38,000 in cash, over $28,000 from Gema, $16,000 from Eulogio, and $35,000 from Illinois Concrete. It also made unusual non-claim, non-underwriting disbursements or purchases for an insurance carrier, such as financing trucks that were titled in the name of other entities; transferring $22,000 to Patel; transferring money to ABR; making payments on Eulogio's automobile and bank loans; paying $10,000 for a boat for Eulogio; transferring $34,000 to Midwest; transferring $60,000 that was then used to purchase the Lenox property; and Pakter believed that Eulogio withdrew $135,000 and used this in the TCOB acquisition. Pakter opined that American Fire was essentially a pass-through entity with PISI funds going through it to Illinois Concrete because

American Fire was primarily funded by PISI, and American Fire transferred $150,000 to Illinois Concrete. Pakter noted that American Fire was not registered in Illinois as an insurance carrier and it did not pay the federal or state taxes. Pakter did not know whether American Fire tendered a defense to the cease and desist action, or if American Fire had already stopped operating before that.

¶ 63        With regard to PISI, Pakter testified that its biggest source of funds came from Patel as its largest insurance customer. Pakter agreed that the funds PISI received from Patel occurred over the course of 10 years and it was normal for PISI to receive premiums for its insurance policies, keep some funds as a commission, and disburse the rest to the insurance company that held the policy. Pakter testified that Patel's involvement with TCOB, American Fire, ABR, and Illinois Concrete was further evidence that these entities constituted a single enterprise. He testified that PISI's trust account received over $44,000 in cash, which was unusual for an insurance agency. He testified that it was also unusual that PISI paid American Fire's telephone bill, that PISI paid Gloria Bailey's wages, who worked at both PISI and American Fire; that PISI paid Midwest over $30,000; that PISI dispersed over $11,000 to Eulogio and $10,000 to ABR; and that PISI paid ABR's credit card bills. He testified that PISI's operating account dispersed over $390,000 to Gema and it also made payments on her real estate or other bank loans.

¶ 64        Pakter opined that Midwest received cash proceeds for materials that it did not order or pay for, such as the generators from Willow. Pakter testified that other irregular transactions included $16,000 from the sale of vodka and $45,000 from the sale of diesel fuel, both regulated products being sold by an unregulated entity. The records showed various deposits and withdraws by or to Gema, PISI, or Eulogio, but without sufficient documentation for the reason. There were payments to Stringer Blacktop, but Illinois Concrete also paid Stringer Blacktop.

¶ 65       Pakter testified that in total, PISI and Illinois Concrete directly paid Gema over $1.8 million between 2005 and 2014. He conceded that all but $1,200 came from PISI and that it was not unusual for her to be paid by her own company. He testified that PISI and Illinois Concrete also paid for expenses that indirectly benefited her in the amount of $670,000 through other entities. Eulogio received over $117,000 from ABR, Illinois Concrete, Midwest, and PISI, and they paid over $183,000 on his behalf. He opined that in total, Gema and Eulogio benefited by more than $2.5 million. He observed several indicia of deception: extensive use of cash and significant volumes of cash deposits and withdrawals, internal control issues such as using handwritten checks instead of computerized records, transferring money between several entities, and one individual signing for another. He did not identify any specific transaction as fraudulent as he believed this was the province of the court. Pakter testified that his firm had billed plaintiff's attorney for 950 hours of work for review and analysis of the 150,000 documents involved in this case, which amounted to $144,000, and did not include his deposition or the trial.

¶ 66       Frederick Bingham testified as an insurance business expert for Willow. Based on his review of the records, depositions, and Pakter's report, Bingham opined that Gema, Eulogio, and PISI engaged in an inappropriate relationship with American Fire. He opined that Gema was transacting business through PISI in Illinois in violation of the law with American Fire as an unauthorized insurer of the policies she sold. Bingham observed that there was a lack of documentation demonstrating a legitimate insurance business relationship between Gema, Eulogio, PISI, Chaudhari, and American Fire. Bingham testified that there was a lack of separation between PISI, American Fire, Illinois Concrete, and Gema's and Eulogio's activities. He testified that Illinois Concrete was a "minor factor" in his analysis in that it repaired Princess

Foods after it sustained fire damage. Bingham opined that based on Pakter's report, Gema received the majority of the financial benefits from PISI. Bingham estimated that Chaudhari should have received substantial compensation as the surplus lines licensee because a typical commission was 30% of the premium. Bingham testified that the taxes and fees that should have been paid to the Illinois Surplus Lines Association for each policy sold were never paid.

¶ 67    He testified that based on the Pakter's report, approximately 70% all of the money that American Fire received came from PISI's trust account, and American Fire would not exist without PISI. However, he conceded that it made sense that a most of the funds American Fire received from PISI were for insurance premiums. He believed it was usual for it to be so reliant on one insurance agent but conceded that there was nothing wrong with a wife running an insurance agency and a husband running an insurance company. Bingham observed that the fact that many checks had a blank memo line made it difficult to discern what payments were for, but he was unaware that the checks originally had check stubs which may have contained this information. Bingham opined that a "notable percentage" of payments from American Fire did not appear to be for legitimate insurance purchases, such as the purchase of the Mercedes and other vehicles, a down payment on a boat, and real estate-related payments. He also found it problematic that these assets were not titled in American Fire's name. He testified that American Fire was undercapitalized to pay a large loss if one occurred.

¶ 68    On cross-examination, Bingham testified that in his review, he did not find an instance where there was a surplus lines insurance policy produced but the insured would have been eligible for standard insurance. He was unaware of any claims that American Fire or PISI ever defrauded a customer. He testified that the regulatory case was initiated by Willow's attorney.

Gema was found liable of an instance of improper transaction of business in that she wrote one check in 2012 to an unauthorized insurance company (American Fire).

¶ 69    On September 18, 2017, the trial court entered a written order in favor of all defendants and against Willow on all counts of the third amended complaint, finding that Willow failed to meet its burden of proof on any of its claims. The trial court found that Willow's theories of liability and claimed conspiracy rested on a tenuous set of facts and this was simply a case of a construction company—Illinois Concrete—unable to meet its financial obligations. Regarding count I, the trial court held that Willow voluntarily extended credit to Illinois Concrete which had a limited credit history and was a poor credit risk, but the failure of Illinois Concrete to pay for the sale of goods on credit did not prove a vast scheme to defraud. It found that Willow failed to show that Gema had a connection to Illinois Concrete or that the dishonored checks were reason to pierce the corporate veil.  Regarding count II, the trial court found insufficient proof of fraud as there was no evidence connecting Gema to the checks, and although Ljubic advised Willow that there were insufficient funds to honor the first check, this was not a basis to set aside the corporate form and hold an employee liable. As to count III, the court found no evidence of a civil conspiracy by the individual defendants for the same reasons as count II.  As to count IV, piercing the corporate veil of Midwest, the trial court found that the judgment Willow obtained against Midwest had been vacated by the appellate court. Similarly, the trial court found no basis to pierce the corporate veils of PISI or the Miracle defendants in count V as they had nothing to do with Illinois Concrete and were separate corporate entities. The trial court observed that count VI for prejudgment attachment was being handled by a different judge. The trial court held that the claim for promissory fraud in count VII failed for the same reasons as count II and III. The

trial court also found that Willow's claim of successor liability against PIA in count VIII lacked any basis.

¶ 70    Following the trial court's September 18, 2017, judgment, Willow filed a motion to reconsider and a motion for leave to file a fourth amended complaint. Defendants filed a motion requesting that Willow's pending motion for prejudgment attachment be denied. Willow's petition for prejudgment attachment was dismissed with prejudice.

¶ 71    On May 14, 2018, the trial court entered an order denying Willow's motion to reconsider and denying Willow's motion to file a fourth amended complaint. The trial court found that the litigation had proceeded for eight years and Willow had engaged in extensive discovery, but it had failed to meet its burden. It found that the proposed fourth amended complaint contained allegations contrary to the trial evidence. Willow filed a timely notice of appeal.

¶ 72                                      II. ANALYSIS

¶ 73                                      A. Jurisdiction

¶ 74    On appeal, we must first address the jurisdictional arguments Gema, Eulogio, Ljubic, PISI, PIA, and the Miracle defendants (defendants-appellees) raise regarding the orders of default and the default judgment entered against Budz and Illinois Concrete.

¶ 75    A court must have both jurisdiction over the subject matter and the person in order to enter a valid judgment. *BAC Home Loans Servicing, LP v. Mitchell*, 2014 IL 116311, ¶ 17. "Personal jurisdiction may be established either by service of process in accordance with statutory requirements or by a party's voluntary submission to the court's jurisdiction." *Id.* ¶ 18. "A judgment entered by a court without personal jurisdiction is void and may be challenged at any time, either directly or collaterally." *Id.* ¶ 17. Issues involving jurisdiction are reviewed *de novo*. *Id.* ¶ 17. In determining whether a default judgment is void for lack of personal jurisdiction

over a defendant, the defendant bears the burden of showing by clear and convincing evidence that the service of process was invalid. *In re Jafree,* 93 Ill. 2d 450, 455 (1982); *Paul v. Ware,* 258 Ill. App. 3d 614, 618 (1994).

¶ 76     Defendants-appellees first contend that Budz and Illinois Concrete were never properly served with Willow's original complaint. Defendants-appellees argue that although Willow obtained an order for appointment of special process server pursuant to section 2-203.1 of the Illinois Code of Civil Procedure (the Code) (735 ILCS 5/2-203.1 (West 2010)), this order was granted in error.

¶ 77     However, Budz and Illinois Concrete never challenged the order appointing a special process server in the lower court. After years of extensive litigation in the trial court, Eulogio, Gema, Ljubic, Midwest, PISI, PIA, and the Miracle defendants raise this specific contention for the first time on appeal. It is well established that an appellant waives an issue on appeal by not raising it before the circuit court. *Helping Others Maintain Environmental Standards v. Bos,* 406 Ill. App. 3d 669, 695 (2010) ("Generally, a party who does not raise an issue in the trial court forfeits the issue and may not raise it for the first time on appeal.").

¶ 78     Even were this court to overlook the failure to raise this issue before the circuit court, we observe that section 2-203.1 provides that, if service is otherwise impractical, a plaintiff may move for a court order directing a comparable method of service and providing an affidavit stating why service is impractical and stating the nature and extent of investigation made to find the defendant. 735 ILCS 5/2-203.1 (West 2010). The record reflects that service on Budz was effectuated by special process server pursuant to section 203.1 of the Code and he was served personally at his home at Hillcrest Drive shortly after the complaint was filed. Defendants-appellees concede that in obtaining the order for special process server, Willow supported it by

relying on affidavits from another party in one of the cases that was consolidated with the present case. Defendants-appellees also concede that Budz was served at his home fifteen days after the order was entered. We also observe that at trial, Budz testified that he was served with the initial complaint around February 26, 2011, and that a judgment of $389,712.04 was entered against him, but that he did not know that a first amended complaint was filed before entry of the default judgment.[7]

¶ 79        Defendants-appellees additionally contend that Illinois Concrete was never properly held in default because the June 24, 2011, order of default provided that Illinois Concrete was found in default for failing to appear or plead "to the Summons served on the Illinois Secretary of State on December 2, 2010," but this December 2, 2010, date was before Willow filed its original complaint and appears to relate to a complaint filed in one of the other consolidated cases. However, defendants-appellees fail to cite any case law or other legal authority to support their assertion; they merely declare that the order of default was not effective, without further elaboration. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017) (requiring that the argument section of appeals briefs "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on"). "The failure to assert a well-reasoned argument supported by legal authority is a violation of Supreme Court Rule 341(h)(7) [citation], resulting in waiver." *Sakellariadis v. Campbell*, 391 Ill. App. 3d 795, 804 (2009). We additionally observe that the trial court also entered an order of default against Budz on July 19, 2011, which defendants-appellees do not challenge as invalid on appeal. We further note that, even if the trial court recited the wrong summons in its order of default against Illinois Concrete,

---

[7] We also note that on October 4, 2013, the trial court entered an order holding, *inter alia*, that Budz had appeared in court and agreed he would accept service of process at 8500 Hillcrest Drive, Orland Park, Illinois.

the trial court stated in the default judgment that it held Illinois Concrete in default on June 24, 2010.

¶ 80    Next, defendants-appellees contend that Budz and Illinois Concrete were never properly served with Willow's first amended complaint, and that the January 13, 2012, default judgment was entered based on that version of the complaint. They argue that the default judgment is thus void for lack of jurisdiction.[8] Willow does not dispute that Illinois Concrete and Budz were not properly served with the first amended complaint. Instead, Willow asserts that defendants-appellees do not have standing to challenge personal jurisdiction over Budz and Illinois Concrete.

¶ 81    Unlike their previous contentions, defendants-appellees raised this issue before the trial court. Before trial, Willow filed a motion for summary judgment. In response, defendants Gema, Eulogio, Ljubic, PISI, American Fire, Midwest, the Miracle defendants, and PIAI argued, *inter alia*, that the default judgment entered against Budz and Illinois Concrete was void because the first amended complaint was never served on Budz or Illinois Concrete and the default judgment was based on the first amended complaint. The trial court denied the motion for summary judgment in a written order on April 6, 2017, but did not specifically rule on this jurisdictional argument. Defendants-appellees also raised the issue in an oral motion during trial. The trial court did not address the oral motion in its September 18, 2017, written order. "A court's failure

---

[8] The record reflects that Willow filed its first amended complaint on April 12, 2011. In its original complaint, Willow asserted breach of contract, vexatious delay, replevin, and prejudgment attachment and named Illinois Concrete and Budz as defendants. In its first amended complaint, Willow added Eulogio and Ljubic as defendants and brought claims for breach of contract, vexatious delay, and replevin, as before. It also added claims for common law fraud and civil conspiracy against Budz, Ljubic, and Eulogio, based on the same grounds, *i.e.*, the checks tendered to Willow and failure to pay for the materials ordered. As defendants-appellees note, the January 12, 2012, default judgment specifically states that Willow filed a five-count amended complaint and lists the counts consistent with its first amended complaint. The default judgment further provides that, following a hearing on Willow's proof of damages, the trial court concluded that Willow was damaged in the amount of $389,712.04. Thus, it appears that defendants-appellees are correct in asserting that the default judgment was entered based on the first amended complaint.

to rule on a motion does not constitute a denial of the motion. [Citations.] Rather, 'it is the responsibility of the party filing a motion to request the trial judge to rule on it, and when no ruling has been made on a motion, the motion is presumed to have been abandoned absent circumstances indicating otherwise.' " *Mortgage Elec. Sys. v. Gipson*, 379 Ill. App. 3d 622, 628 (2008) (quoting *Rodriguez v. Prisoner Review Board,* 376 Ill. App. 3d 429, 433 (2007)).

¶ 82     Regardless of whether this issue was abandoned, we conclude that defendants-appellees do not have "standing to challenge the validity of the circuit court's dismissal order based on lack of personal jurisdiction. Because service and personal jurisdiction can be waived, only the party to whom service is owed can object to improper service." *People v. Matthews*, 2016 IL 118114, ¶ 23. In *Matthews*, our supreme court concluded that the defendant lacked standing to challenge the validity of the circuit court's dismissal order based on his claim that he failed to properly serve the State, and thus the court lacked personal jurisdiction over the State. *Id*. ¶ 23. The court held that because service and personal jurisdiction can be waived, only the party to whom service is owed can object to improper service, which in that case was the State. *Id*. ¶¶ 19-23 (citing *In re M .W.,* 232 Ill. 2d 408, 427 (2009) (Internal quotation marks omitted.) (A party "may object to personal jurisdiction or improper service of process only on behalf of himself or herself, since the objection may be waived."). See also *Odle v. Department of State Police*, 2015 IL App (5th) 140274, ¶ 23 ("The petitioner does not have standing to challenge the circuit court's personal jurisdiction over another party."). Here, defendants-appellees are attempting to raise an issue of personal jurisdiction not on behalf of themselves, but on behalf of Budz and Illinois Concrete. Accordingly, they lack standing to raise such a challenge.

¶ 83     Willow contends that the default judgment is valid because the first amended complaint did not change or expand the cause or action or requested relief and a defendant does not have an

absolute right to answer an amended complaint under such circumstances. "[W]here a plaintiff files an amendment of substance to its complaint, the defendant must be afforded an opportunity to answer the amended complaint. [Citations.] Where the amendment is immaterial, however, a defendant has no absolute right to file a new answer." *American Pharmaseal v. TEC Systems*, 162 Ill. App. 3d 351, 359 (1987). In its first amended complaint, Willow brought claims for breach of contract, vexatious delay, and replevin, as before, and added Eulogio and Ljubic as defendants. It also added claims for common law fraud and civil conspiracy against Budz, Ljubic, and Eulogio, based on the same grounds and requested the same relief, *i.e.*, the checks tendered to Willow and failure to pay for the materials ordered in the amount of $386,712.04. Although the default judgment was entered based on the first amended complaint, it is apparent that the allegations against Illinois Concrete and Budz and the requested relief were nearly identical between the initial and first amended complaint.

¶ 84                                    B. Bench Trial

¶ 85         On appeal, Willow contends that the trial court erred in deciding not to pierce the corporate veil of Illinois Concrete to hold Eulogio, Gema, Ljubic, and Midwest liable for the default judgment entered against Illinois Concrete.

¶ 86         When, as in the present case, a party challenges the sufficiency of the evidence to support the trial court's judgment following a bench trial, the appropriate standard of review is whether that judgment is against the manifest weight of the evidence. *Kroot v. Chan*, 2017 IL App (1st) 162315, ¶ 19. "On review, we will only reverse the finding of the circuit court regarding piercing the corporate veil if it is against the manifest weight of the evidence." *Steiner Electric Co. v. Maniscalco*, 2016 IL App (1st) 132023, ¶ 49. " 'A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be

unreasonable, arbitrary, or not based on evidence.' " *Id.* (quoting *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001)). "Moreover, this court may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied upon that basis or whether the trial court's reasoning was correct." (Internal quotation marks omitted). *Maniscalco*, 2016 IL App (1st) 132023, ¶ 49.

¶ 87        "A corporation is a legal entity that exists separately and distinctly from its shareholders, officers, and directors, who generally are not liable for the corporation's debts. [Citation.] A primary purpose of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity." *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500 (2005). However, a court may disregard the corporate form and attendant limited liability "where the corporation is merely the alter ego or business conduit of another person or entity." *Id.*

¶ 88        A party seeking to pierce the corporate veil bears the burden of making a substantial showing that one corporation is a dummy or sham for another. *Maniscalco*, 2016 IL App (1st) 132023, ¶ 46. "Illinois courts will pierce the corporate veil where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances." (Internal quotation marks omitted.)  *Buckley v. Abuzir,* 2014 IL App (1st) 130469, ¶ 12. In examining the first prong, courts examine multiple factors, including:

> " '(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of

assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.' " *Maniscalco*, 2016 IL App (1st) 132023, ¶ 47 (quoting *Fontana,* 362 Ill. App. 3d at 503).

¶ 89     Under the second prong, courts examine " 'whether the circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances.' " *Id.* ¶ 48 (quoting *Buckley,* 2014 IL App (1st) 130469, ¶ 34).

¶ 90     " 'The doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract.' " *Fontana*, 362 Ill. App. 3d at 500 (quoting *Peetoom v. Swanson,* 334 Ill. App. 3d 523, 527 (2002)). Courts employ the doctrine of piercing the corporate veil reluctantly. *Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1033 (2007). This is especially true in breach of contract cases, where "courts should apply even more stringent standards to determine when to pierce the corporate veil than they would in tort cases." *Id*. " 'This is because the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form.' " *Id.* (quoting 1 W. Fletcher, Cyclopedia of Corporations § 41.85, at 692 (1999)). "In a breach of contract case, additional compelling facts, such as a finding of fraud, may also be required." (Internal quotation marks omitted). *Id.* at 1034.

¶ 91     In its third amended complaint, Willow attempted to extend Illinois Concrete's contractual liability for the items it purchased on credit under various theories of liability. The

common thread throughout was Willow's assertion that Eulogio, Gema, and Ljubic should be held liable because they used Illinois Concrete as a sham corporation and failed to respect corporate formalities between the various entities. All of Willow's claims were premised on the allegation that defendants engaged in an elaborate scheme to defraud various suppliers, including Willow, by purchasing goods on credit and re-selling them (without paying for them) and using the various defendant entities to hide or transfer money. On appeal, Willow relies heavily on the testimony of its paid forensic accounting expert, Pakter, to support its argument that Illinois Concrete, Midwest, PISI, American Fire, and ABR essentially comprised a single enterprise operated by Gema and Eulogio. Willow extensively cites Pakter's testimony about the 15,000 checks written to or by the various entities and individuals that Pakter examined in arriving at his opinions. Willow cites Pakter's testimony that there was indicia of commingling funds, transfers of money without proper documentation, providing free services or goods, purchasing goods or real estate with money from one entity but titling them in another entity's name, writing checks made out to "cash."

¶ 92    However, in concluding that Willow failed to meet its burden of proof, the trial court found that Willow's theory,

> "rests on supposedly assumed identities, phone calls with disguised voices, and at least one instance where some individual donned a ski mask and picked up electrical supplies ***. The claimed conspiracy extends to property in Michigan and an insurance holding company chartered in the Caribbean. But whatever the inferences to be drawn from that tenuous set of facts, the reality is quite mundane: this case amounts to one more construction company unable to meet its financial obligations in 2010 and 2011. Indeed, Willow Electric

had suspended Illinois Concrete's account in 2009 due to a sporadic payment history. *** There is no basis in the evidence presented at trial to transfer or extend Illinois Concrete's contractual liability to any other entity or person."

¶ 93    The trial court clearly discounted Pakter's testimony and found it insufficient to establish the broad ranging conspiracy alleged by Willow to justify piercing Illinois Concrete's corporate form. On appellate review, we defer to the trial court's assessment of the credibility of Pakter and the other witnesses and the weight to be accorded their testimony. As the trier of fact, the trial judge in a bench trial is in a superior position to assess the credibility of the witnesses and determine the weight to be accorded their testimony." *Kroot*, 2017 IL App (1st) 162315, ¶ 19. Even where conflicting evidence is presented, we defer to the trial court's assessment of the credibility of the witnesses, weight of the evidence, and inferences to be drawn. *Id.*; *In re D.F.,* 201 Ill. 2d 476, 499 (2002). On review, we are mindful that we must not substitute our judgment for that of the trier of fact. *Pack v. Maslikiewicz*, 2019 IL App (1st) 182447, ¶ 92. We will " 'not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder.' " *Id.* (quoting *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995)). Rather, we uphold the trial court's judgment as the trier of fact where there is any evidence to support it. *Nokomis Quarry Co. v. Dietl,* 333 Ill. App. 3d 480, 484 (2002).

¶ 94    It is noteworthy that Pakter received a substantial sum for his work on the case, having billed $144,000, not including the time for his deposition or the trial. We further observe that Pakter's testimony that various transactions were fraudulent was frequently at odds with testimony from other witnesses providing alternative, innocent explanations. Ultimately, Pakter's testimony failed to adequately demonstrate the purported ongoing fraudulent conspiracy between

Eulogio, Ljubic, Gema, Illinois Concrete, Midwest, PISI, and American Fire. For example, Pakter testified that Illinois Concrete and PISI paid $1.8 million directly to Gema. However, only approximately $1,200 of that came from Illinois Concrete. Similarly, Pakter indicated that American Fire and PISI were essentially the same organization based in part on his opinion that Eulogio received over $183,635 to pay his expenses. However, when viewed separately, American Fire provided the large majority—$182,212—of that amount, while PISI provided $1,423. Pakter called into question the legitimacy of payments by Gema to Eulogio or his companies. However, Gema's and Eulogio's testimony showed that his companies performed general contractor work on her real estate property and she paid them for that work. Pakter opined that American Fire's decision not to defend against a cease and desist proceeding was an indicia of fraud, but according to Eulogio and Gema, the organization had ceased operating and it was not worth the expense to defend against the action. Pakter also opined that money transferred from Illinois Concrete to Miracle Investments that was related to an employee (Gutierrez) demonstrated fraud. However, Pakter rejected the testimony that this arrangement was in place to pay that employee's rent before the employee could spend the money elsewhere.

¶ 95 Moreover, Willow focuses on Pakter's testimony but fails to account for the testimony of the other witnesses. For example, Ljubic's testimony supported that Illinois Concrete had a functioning president, Budz, and made legitimate transfers of money. Ljubic testified Budz authorized her to handle the bookkeeping matters for Illinois Concrete. She explained, quite reasonably, that she could not specifically remember what each check of the thousands of checks involved in the case were for, as this occurred almost ten years before trial, but withdrawals and advances were usually for reimbursements for expenses, to pay a contractor in cash, or to give to an owner, and she usually indicated which project or property a check related to on the check

stub. She testified that there were large binders with receipts for the payments, although she did not know what had happened to them. She testified that the checks she cashed for herself were for reimbursement for purchasing construction or office supplies, that the checks to "cash" where the memo lines referred to Eulogio or Budz were often for reimbursing them for construction supplies or paying contractors, who preferred to be paid in cash. She also testified that Eulogio was not paid any money other than what he was appropriately entitled to for reimbursements and work he performed. She did not recall Illinois Concrete having a construction project with Rivers Casino or recall writing the two checks for $85,000 and $125,000. She testified that Illinois Concrete used a truck in its general contracting work, that the check related to TCOB for Eulogio was for work performed by Illinois Concrete in Michigan; and the check for $20,000 related to Lakeshore Hospitality could have been for paying a contractor. Further, her testimony established that she had no connection to Gema, PISI, and American Fire, only a minor role at Midwest, and she did not know about money flowing between these entities and Illinois Concrete. There was no evidence that Ljubic controlled Illinois Concrete or used it as her alter ego.

¶ 96    With regard to Eulogio, Willow contends that Pakter's testimony demonstrated that Eulogio stripped Illinois Concrete of its assets. However, Eulogio's testimony showed a legitimate business relationship and explained many inconsistencies or irregularities pointed out by Pakter. According to Eulogio, he and Budz began working on construction projects together for Illinois Concrete and Eulogio solicited his large commercial insurance clients, but no commissions went through Gema or PISI. Eulogio explained that the larger checks from Illinois Concrete to him or "to cash" were for reimbursements for materials, commissions owed to him, or to pay vendors and subcontractors. Like Ljubic, he explained that the checks originally had

stubs attached which contained information about the reasons for the payments, but the stubs were detached before depositing the checks. He testified that he did not order materials from Willow or pick up materials wearing a ski mask and that Budz directed that Illinois Concrete order the materials. He rented a storage yard on Oakton in Evanston before Budz took it over in 2009, but Eulogio did not know about electrical materials found there, and he became very sick with cirrhosis and Budz began taking over everything. Eulogio also testified that he believed the generators belonged to Budz; he sold them through Midwest because that is the business he used to sell excess materials, and he gave some money to Budz and kept some because Budz owed him money. He testified that he sold the diesel for Budz because Budz asked if he knew someone who would want it because Eulogio insured transportation companies. Eulogio testified that Budz signed over title of a truck to him because Budz owed money for storing materials. He testified that Illinois Concrete was the general contractor at the projects on the Lenox and 14th Street properties, and also performed the general contractor work at Princess Foods following the fire insurance claim because it could perform the work for less than another adjuster's estimate. Eulogio explained that Budz's name appeared on early documents for the Lenox property because they initially planned it to be a joint venture, but Budz later backed out. Eulogio testified that he purchased the Mercedes for his wife to compensate her for work she performed for PISI. He testified that Black Diamond Concrete was formed in Michigan to develop the TCOB property, which never materialized, and Illinois Concrete performed some preliminary work on it.

¶ 97       Although Budz's testimony differed from Eulogio's in some respects, it did not establish that Illinois Concrete was a sham corporation used by the other entities, Eulogio, Gema, and Ljubic to enrich themselves. Budz confirmed that he was president of Illinois concrete until

2009, but he left the financials, bookkeeping, soliciting clients, contractual matters completely to Eulogio and Ljubic. Thus, although he testified that he did not specifically authorize the majority of the checks, his lack of knowledge regarding their authenticity is unsurprising. His testimony that he was paid by cash or check aligned with the testimony of Eulogio and Ljubic. Moreover, Budz confirmed that he and Eulogio purchased a truck together; but Budz never paid Eulogio back and he assumed Eulogio owned the truck. Given his previously mentioned lack of involvement in the financial aspects of business, it is also not surprising that Budz was unaware of how the title arrangements for the truck would be handled. His testimony also confirmed that, regardless of his lack of knowledge of the business structure involved in the Michigan property project, he did perform some work on the property. Additionally, although Budz expressed ignorance regarding the sale of the generators and fuel, this evidence was not relevant to establishing Willow's claim that Gema, Ljubic, Eulogio, PISI, American Fire, and the Miracle Defendants used Illinois Concrete as an alter ego corporation to obtain electrical equipment without paying for it. Also relevant to Budz's credibility as a witness, the evidence indicated that Budz was going through bankruptcy during the time period at issue in this case.

¶ 98    Additionally, the evidence showed that Gema had little connection to Illinois Concrete, let alone that she was using it to scam Willow out of hundreds of dollars' worth of electrical materials. While Willow presented much evidence regarding PISI and American Fire as insurance entities, Willow failed to establish a connection between PISI, American Fire, and Gema on one hand, and Illinois Concrete on the other. Gema explained that checks from PISI to American Fire were for premiums due to American fire, which Pakter confirmed was a reasonable arrangement. She testified that she hired Eulogio as a general contractor on several of her real estate projects, but she has always paid him for his work and the work of his companies

and she did not control his companies. She had never heard of Willow, DeGroate Petroleum, or Illinois Brick until this litigation. Like Eulogio, she testified that she did not defend against the cease and desist order against American Fire because it was no longer in business and it would not impact PISI or her work as an insurance agent. She testified that she learned in 2010 or 2011 that Budz was improperly using her office address as an address for Illinois Concrete and she took action to stop him. Eulogio testified that Gema had nothing to do with Illinois Concrete, American Fire, the Michigan property, Black Diamond Concrete, or his other construction companies ABR or Brad Contractors.

¶ 99        Thus, we agree with the trial court that "[Gema] has virtually no connection to Illinois Concrete. [Eulogio and Ljubic] were employed by Illinois Concrete, but that affiliation—even when coupled with dishonored checks—is an insufficient basis to pierce the corporate veil." The trial court's determination that Illinois Concrete's failure to pay for the electrical materials "does not transform a routine transaction *** into a vast scheme to defraud" was not against the manifest weight of the evidence. When considering all of the evidence presented at trial, and deferring to the trial court's superior vantage point to assess witness credibility, we find that the trial court's determination that Willow had failed to meet its burden of proof as to veil-piercing in count I was not against the manifest weight of the evidence. *Maniscalco*, 2016 IL App (1st) 132023, ¶ 49.

¶ 100        Similar to count I, Willow alleged in count II of its third amended complaint that Eulogio, Gema, and Ljubic engaged in common law fraud in presenting the two checks from Illinois Concrete to Willow. To show fraud,

> "a plaintiff must allege and prove: (1) a false statement of material fact; (2)
> the party making the statement knew or believed it to be untrue; (3) the party

to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury." *Siegel v. Levy Organizational Development Co., Inc.*, 153 Ill. 2d 534, 542-43 (1992).

¶ 101    As with count I, Willow failed to establish Gema's, PISI's, or American Fire's connection to the Illinois Concrete checks given to Willow. Further, there was testimony that a representative from Illinois Concrete—Budz, Ljubic, or Eulogio in disguise—informed Willow that there were insufficient funds to cover its credit purchases and asked Willow to wait for payment. The fact that a stop payment order was then issued on the check does not necessarily indicate fraud, as it is just as likely that Illinois Concrete wanted to avoid bouncing a check. That a construction business struggled to pay its bills did not establish a basis to disregard Illinois Concrete's corporate form and hold its employees or officers liable. The evidence also called into question whether Willow could reasonably rely on Illinois Concrete's representations regarding payment considering (1) Willow's contention that someone was disguising his voice on the phone to pose as Budz, (1)  Illinois Concrete's poor credit history with Willow in maxing out its initial small line of credit quickly, failing to repay it promptly, having its account suspended, and taking two years to pay off a minimal balance; and (3) Willow's decision to allow a sudden, drastic increase in Illinois Concrete's credit limit from $15,000 to $400,000.

¶ 102    For similar reasons outlined in our analysis of count I and II, we find that the trial court's decision that Willow's proofs failed to establish a civil conspiracy in count III was not against the manifest weight of the evidence. A civil conspiracy is an intentional tort that consists of a

"combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." (Internal quotation marks omitted.) *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill. 2d 102, 133(1999). To recover under this theory, a plaintiff must prove an agreement that is knowingly and intentionally made, and a tortious act committed in furtherance of the agreement. *Id.* at 133-24. A defendant who engages in accidental, inadvertent, negligent, or innocent conduct that furthers the purpose of the conspiracy is not liable for civil conspiracy, and mere knowledge of fraudulent actions is also insufficient. *Id.* Willow's attempt to impose liability on Eulogio, Gema, and Ljubic for an alleged civil conspiracy in tendering the two checks to Willow relies on the same evidence and fails for the same reasons. As stated, Willow failed to establish any knowing, intentional agreement between the three individual defendants to defraud Willow.

¶ 103    In count IV, Willow argued for piercing the corporate form of Midwest, claiming it was another shell corporation of Eulogio, Gema, and Ljubic and that the individual defendants should be held liable for the default judgment entered against Midwest on October 4, 2013. As the trial court correctly recognized in finding against Willow on this count, the October 4, 2013, default judgment against Midwest was vacated by this court in a prior appeal, and therefore there is no basis to impose liability. The only count against Midwest was based on a judgment that was reversed. Willow never amended the complaint to provide an alternate theory  of liability.

¶ 104    With respect to count V—Willow's claim to pierce the corporate veils of PISI and the Miracle defendants—the trial court found that PISI and the Miracle defendants had nothing to do with Illinois Concrete, Willow's decision to extend credit, or Illinois Concrete's failure to pay, and that the trial evidence showed that these were separate entities. Similar to our analysis regarding counts I, II, and III, we also find this determination was not against the manifest

weight of the evidence. There was insufficient evidence showing a connection between Gema, PISI, and the Miracle defendants on one hand, and Illinois Concrete on the other. Gema testified that before this litigation, she had not heard of Willow or spoken to Wardzala, she was not part of an enterprise to defraud anyone, and she did not authorize Budz to use her business address for Illinois Concrete. There was no evidence regarding the Miracle defendants that would justify disregarding their corporate form.

¶ 105        With respect to count VI, Willow raises no arguments on appeal regarding this count, and we therefore do not address it.

¶ 106        Turning to count VII, Willow claimed promissory fraud based on similar allegations as in counts II and III. "Generally, under Illinois law there is no action for promissory fraud, meaning that the alleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct." *Ault v. C.C. Services, Inc.*, 232 Ill. App. 3d 269, 271 (1992). "The promissory fraud alleged here is a promise to perform a contract with an intention not to perform. Illinois courts have held that this is not actionable. [Citation.] However, Illinois does recognize an exception to the non-liability for promissory fraud rule if the promise is part of a scheme employed to accomplish the fraud." *Stamatakis Industries, Inc. v. King*, 165 Ill. App. 3d 879, 882 (1987). For the same reasons we outlined above, we also find the trial court's decision that Willow failed to establish promissory fraud was not against the manifest weight of the evidence.

¶ 107        Lastly, we hold the trial court's decision regarding count VIII, that there was no basis to extend successor liability to PIA from PISI, was not against the manifest weight of the evidence. Generally, the corporate purchaser of another corporation's assets is not liable for the debts and liabilities of the seller, unless one of four exceptions applies: "(1) where there is an express or

implied agreement of assumption [of liability]; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Pielet v. Pielet,* 407 Ill.App.3d 474, 508 (2010). The mere continuation exception applies where there is an identity of ownership and the new corporation is simply a reincarnation of the selling corporation. *Workforce Sols. v. Urban Services of Am., Inc.*, 2012 IL App (1st) 111410, ¶ 87. The fraudulent purpose exception requires greater specificity in establishing what misrepresentations were made, when, and by whom. *Abazari v. Rosalind Franklin University of Medicine and Science*, 2015 IL App (2d) 140952, ¶ 13. As stated, there was no evidentiary basis to extend Illinois Concrete's contractual liability to Willow to Gema or her insurance agency PISI. Thus, there is no basis to extend such liability to PIA.

¶ 108      We also note that on appeal, Willow has not argued any basis for reversal of the trial court's judgment as it relates to the Miracle defendants. We therefore find that any such contention has been waived. It is a "well-established principle of appellate review" that "failure to argue an issue in the opening brief waives that issue on appeal." *Fink v. Banks*, 2013 IL App (1st) 122177, ¶ 15.

¶ 109                          C. Motion to Reconsider

¶ 110      Willow next contends that the trial court erred in denying its posttrial motion to reconsider the September 18, 2017, order following the bench trial.

¶ 111      A party may bring a motion to reconsider under section 2-1203 of the Code (735 ILCS 5/2-1203 (West 2010) for the purpose of bringing " 'to the trial court's attention newly discovered evidence not available at the time of the first hearing, changes in the law, or errors in the previous application of existing law to the facts at hand.' " *Nissan Motor Acceptance Corp. v.*

*Abbas Holding I, Inc.*, 2012 IL App (1st) 111296, ¶ 16 (quoting *River Village I, LLC v. Central Insurance Cos.,* 396 Ill. App. 3d 480, 492 (2009)). We review a trial court's decision to grant or deny a motion to reconsider for an abuse of discretion. *Id.* "If a motion for reconsideration requests the court to change its mind about its factual findings, we will find no abuse of discretion in the grant or denial of the motion unless the court's revised factual findings, or the factual findings to which it decided to adhere, are against the manifest weight of the evidence." *Schulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 22. Where the motion presents a question of law or claims that the trial court applied the wrong legal standard, review is *de novo*. *Nissan Motor Acceptance Corp.*, 2012 IL App (1st) 111296, ¶ 16.

¶ 112      In the motion to reconsider, Willow argued that the trial court erred in declining to pierce the corporate veil of Illinois Concrete in light of all the factors of the corporate veil-piercing test in counts I, IV, and V under the totality of the evidence. Regarding the fraud and promissory fraud counts II and VII, Willow argued that the trial court misapplied the law and read the facts too narrowly, as the fraudulent scheme was demonstrated by not merely one bad check, but by the fraudulent signature, the conversion of the generators and electrical equipment, DeGroate Petroleum's fuel, and Illinois Concrete's low bank balance. Willow argued that it demonstrated a civil conspiracy in count III based on evidence that Gema and Eulogio improperly obtained funds for their insurance businesses American Fire and PISI, moved the funds around and used them to benefit themselves, and Illinois Concrete's pattern of conspiracy was demonstrated by its relationships with Illinois Brick and the storage yard. In denying the motion to reconsider, the trial court held that it reviewed the briefs and trial evidence and "remains firmly convinced that Plaintiff failed to prove its case at trial."

¶ 113    On appeal, Willow reiterates its argument that the trial court erred in deciding not to pierce the corporate veil of Illinois Concrete given all of the evidence demonstrating that Ljubic misled Wardzala about Illinois Concrete's creditworthiness, Illinois Concrete also swindled DeGroate Petroleum and Illinois Brick, and Gema and Eulogio stripped Illinois Concrete of its assets. Willow's arguments merely attempt to rehash the trial court's factual findings based on the evidence presented at trial. Willow presents no newly discovered evidence or changes in the law. Based on our determination that the trial court's factual findings were not against the manifest weight of the evidence, we find that the trial court did not abuse its discretion in denying the motion to reconsider in that regard. *Schulte*, 2013 IL App (4th) 120132, ¶ 22.

¶ 114    Although Willow additionally contends that the trial court misapplied the law, we find no error in the trial court's application of the law. The trial court accurately cited the law regarding piercing the corporate veil and imposing liability based on fraud, promissory fraud, and conspiracy. The trial court examined the evidence in light of the proper legal standards and determined that the facts did not merit piercing the corporate veils of Illinois Concrete, Midwest, or PISI, or imposing liability based on fraud. We observe that the trial court cited *Towers Investors, LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019 (2007), merely for general propositions of law.

¶ 115    Additionally, we observe that Willow cites a 68-page order entered by the circuit court of Will County in March 2019 against Midwest, Ljubic, Gema, and Eulogio, and in favor of DeGroate Petroleum. Willow urges this court to take judicial notice of the facts presented in the written order and argues that the trial court pierced the corporate veil of Midwest under "substantially" the same theories and evidence. Defendants argue that this court should strike all references to this judgment as it is not part of the lower court record here, it was entered after the

2017 judgments in the present case, and it was subsequently vacated by the Will County court. A court may take judicial notice of a written decision that is part of the record in another court. *Illinois Department of Human Services v. Porter*, 396 Ill. App. 3d 701, 725 (2009). However, we decline Willow's invitation to take judicial notice of the lengthy Will County order as it will not aid the efficient disposition of the present case, which has been on-going since Willow's initial 2011 complaint and involved years of discovery, a two-week trial, and extensive trial exhibits.

¶ 116                              D. Standard of Proof as to Damages

¶ 117       In its final claim of error on appeal, Willow contends that the trial court held it to an improper standard of proof as to damages. Willow contends that loss due to breach of contract must be proven to a reasonable degree of certainty, and that it did in fact establish its damages when the trial court entered the default judgment in the amount of $389,712.04 against Budz and Illinois Concrete.

¶ 118       Where damages are awarded in a breach of contract action, they aim to "place the plaintiff in the same position as if the contract had been performed." *Westlake Financial Group, Inc. v. CDH–Delnor Health System*, 2015 IL App (2d) 140589, ¶ 30. On review, we employ a manifest weight of the evidence standard in assessing a trial court's award of damages following a bench trial. *1472 North Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13.

¶ 119       Willow's argument focuses on the following statement in the trial court's written opinion: "Further, the amount of electrical supplies actually supplied and unrecovered has not been established to a legal certainty." As Willow notes, lost profits are recoverable in a breach of contract action if they are established to a "reasonable certainty." *F. E. Holmes & Son Const. Co., Inc. v. Gualdoni Electric Service, Inc.*, 105 Ill. App. 3d 1135, 1141 (1982).

¶ 120　　　　It is important to view this statement in its full context. The trial court was finding that, in all respects, Willow "failed to meet its burden of proof on any of its claims." Viewed in context, the trial court found:

"Plaintiffs theory of liability rests on supposedly assumed identities, phone calls with disguised voices, and at least one instance where some individual donned a ski mask and picked up electrical supplies from Plaintiff. The claimed conspiracy extends to property in Michigan and an insurance holding company chartered in the Caribbean. But whatever the inferences to be drawn from that tenuous set of facts, the reality is quite mundane: this case amounts to one more construction company unable to meet its financial obligations in 2010 and 2011. Indeed, Willow Electric had suspended Illinois Concrete's account in 2009 due to a sporadic payment history. Illinois Concrete, it seems, was not a good credit risk. Further, the amount of electrical supplies actually supplied and unrecovered has not been established to a legal certainty. Boxes of supplies were later recovered by Willow Electric, but were assigned a negligible salvage value. But whatever can be said of the loss Willow Electric sustained, it is a loss that is only recoverable from Illinois Concrete. There is no basis in the evidence presented at trial to transfer or extend Illinois Concrete's contractual liability to any other entity or person."

¶ 121　　　　The trial court's findings make clear that it believed that Willow's theory of liability was not established under the given facts. The evidence related to damages served only to underscore the implausibility of Willow's conspiracy theory. Willow's claim that defendants were involved

in a widespread conspiracy to commit fraud and obtain electrical materials without paying for them was not proven by the evidence it presented in support, which included Willow's invoices to Illinois Concrete, which is where the damages claim of $389,712.04 originated. That Willow appeared to be embellishing the amount of its losses called into doubt its assertion that there was a broad effort to defraud it. As the trial court and defendants point out, inconsistencies between Willow's invoices, Wardzala's testimony, the checks provided by Illinois Concrete, and other evidence undermined Willow's claim of fraud and conspiracy. For example, Willow initially extended only $15,000 in credit to Illinois Concrete. Illinois Concrete quickly maxed out this credit limit and had its credit account suspended when it failed to pay the balance. It took two years for Illinois Concrete to pay off a minimal balance. Despite that fact, Wardzala testified that Willow drastically increased the credit amount to nearly $400,000 between December 7, 2010, and January 26, 2011, merely relying upon a representation that Illinois Concrete had a big job. Representatives from other companies such as Stawski and Stellwagen testified that a decision to extend a large amount of credit in such circumstances would be foolish. This evidence undermined Willow's claim that defendants devised an extensive plan to obtain nearly $400,000 worth of materials on credit without paying for them.

¶ 122    Additionally, Wardzala testified that Willow's billing cycle ended on the 24th of each month. Illinois Concrete delivered a check on January 11, 2011, for $125,000, and the check read "account current." Wardzala agreed that the check would have brought the account current as of January 24, 2011. However, this was not consistent with the invoice from February 8, 2011, which showed that at the end of the December 24, 2010, billing period, $98,084.47 was owed; that $276,867.42 in credit purchases were made during the billing cycle of December 25, 2010 to January 24, 2011; and that $14,760.15 of credit was extended on January 26, 2011. Thus, the

February 8 invoice shows that the account would not have been brought current by the $125,000 check because over $336,000 in purchases were made on credit from December 7, 2010, to January 14, 2011. The February 8 invoice also contradicts Wardzala's testimony about Willow's billing period because it lumped together the purchases made from December 7, 2010, to January 26, 2011, into two periods instead of three. Further, even after Illinois Concrete issued a "stop payment" on the $125,000 check, Willow extended more than $22,000 in credit to Illinois Concrete. Additionally, there was evidence that at least some electrical materials were recovered, but no estimation of their value was provided, and they were considered scrap despite apparently still being in new condition.

¶ 123    Accordingly, we find the trial court did not err when it observed that "the amount of electrical supplies actually supplied and unrecovered has not been established to a legal certainty." This statement merely reflects the trial court's assessment that, regardless of the amount of Willow's loss, Willow did not present a sufficient evidentiary basis to extend liability to any other entity or person besides Illinois Concrete.

¶ 124                                III. CONCLUSION

¶ 125    For the reasons set forth above, we affirm the trial court's order entering judgment against Willow and in favor of defendants-appellees following the bench trial, and its order denying Willow's motion to reconsider.

¶ 126    Affirmed.

¶ 127    PRESIDING JUSTICE GORDON, dissenting:

¶ 128    I must respectfully dissent because all of the evidence in this case supports the conclusion that defendant Illinois Concrete was a dummy or sham corporation for the benefit of Eulogio and Gema Fleites, and their corporations, Professional Insurance Services, Inc. (PISI), and Midwest

Suppliers, Inc. I do not find sufficient evidence to tie in Walter Budz and Karolina Ljubic into their scheme, and I find them to be pawns in this scheme generated by the Fleiteses to cheat creditors and Budz.

¶ 129    As the majority explains in its decision, a party seeking to pierce the corporate veil of a corporation bears the burden of making a substantial showing that one corporation is a dummy or sham for another. *Steiner Electric Co. v. Maniscalco*, 2016 IL App (1st) 132023, ¶ 46. "Illinois courts will pierce the corporate veil where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances." (Internal quotation marks omitted.) *Buckley v. Abuzir*, 2014 IL App (1st) 130469, ¶ 12. In examining the first prong, courts examine multiple factors, including:

> " '(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.' " *Maniscalco*, 2016 IL App (1st) 132023, ¶ 47 (quoting *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503 (2005)).

¶ 130    All of the evidence in this case at bar shows that there was such a unity of interest and ownership that the separate personalities of the corporation, Illinois Concrete, and the parties who compose it no longer existed, and that the circumstances were such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances. In making this determination, I look at the following factors:

¶ 131    (1) INADEQUATE CAPITALIZATION

¶ 132    Walter Budz was an immigrant from Poland who did carpentry work. He met Eulogio, also known as Joe Fleites, after performing rough carpentry work for him. Eulogio asked Budz to go into business with him, and Illinois Concrete was organized in 2004 or 2005 as a corporation. Budz was to be president and do the manual work, while Eulogio was to bring in business and manage construction jobs. There is no evidence that Budz put any money into the business. It is undisputed that Illinois Concrete had inadequate capitalization at the time it was ordering and receiving hundreds of thousands of dollars in electrical and other supplies from plaintiff. Its bank account had a balance of $6447.62 in December 2010. By January 2011, when checks were delivered for $85,000 and then $125,000 to plaintiff, Illinois Concrete's bank account had a balance of $850.48. Its assets were $60,000 and its liabilities were over $700,000.

¶ 133    (2) FAILURE TO ISSUE STOCK, OR (3) TO OBSERVE CORPORATE FORMALITIES, OR TO EVEN ACT AS A CORPORATION

¶ 134    There was no evidence that stock was ever issued for Illinois Concrete, that a corporate book was kept, or that bylaws were ever passed, nor was there evidence of any corporate resolutions, share certifications, proof of offices, board members, elections, minutes of meetings of shareholders, or members of the board of directors. The evidence showed that Illinois Concrete was a nonfunctioning corporation and never acted as a corporation.

¶ 135      Budz testified that he was the designated president of Illinois Concrete but relied on Eulogio and Ljubic to handle the bookkeeping, taxes, and the financial aspects of the business. He claimed he did not order materials or supplies and never heard of plaintiff until he was served with this lawsuit. He was a signatory on the checking account, but claimed the checks written to plaintiff bearing his signature were forgeries and not authorized by him. He testified that, during the time period of the purchase of electrical supplies from plaintiff, he was not involved with the company. Sometime in 2010, he told Eulogio he did not want to be involved with Illinois Concrete anymore and Eulogio told him the company was sold to Romi Andras. It is obvious that Eulogio made Budz president and when he left the company, Eulogio ran its operations with the help of Ljubic. It was Eulogio who dealt with plaintiff as Wieslaw Wardzala, the president of plaintiff, verified through his testimony. Eulogio then placed Andras, a person who lived in Romania since 2008, on the Secretary of State forms as its president. Andras testified by evidence deposition that he had no involvement with Illinois Concrete and was unaware that he was president. In fact, during the period that Budz was involved as president, he received less than $1500 and claimed he received nothing for the fictitious sale to Andras.

¶ 136      Budz testified that he had no knowledge of the many checks written over his claimed signature, including a check for $20,000 to American Fire "for loan reimbursement." Budz knew of no loan that American Fire made to Illinois Concrete, and American Fire was a company owned and operated by the Fleiteses. Budz was unaware of a check to Eulogio for the "McHenry" project and was unaware of work done in McHenry. He was unaware of a check to Eulogio for $5000 for commission for 526 West Deming and did not recall any work at that address; and he was unaware of a check to Eulogio or cash for Art Masonry; a check to the City of Chicago for $10,000 for American Fire regarding the Lenox property; a check for $6500 to

Eulogio for the purchase of a Ford Escape; a check for $14,000 to Eulogio for Sharklins reimbursement; a check to Ljubic or cash for $10,000; a check to Eulogio or cash for $8100; numerous other checks for the Lenox property or the 14th Street project; a check to American Fire for $15,350 for the purchase of a Mack tractor trailer for Eulogio; or a check to Eulogio for $10,000 for the Princess Foods job, in which Budz testified that Illinois Concrete had no involvement.

¶ 137　　　Budz denied placing 23 tote containers of diesel fuel at Eulogio's facility located on 14th Street, but Eulogio testified that Budz asked him to sell the fuel. Eulogio sold the diesel fuel to a friend at Ravenswood Disposal and placed the funds from the sale into his Midwest bank account. The fuel was billed to Illinois Concrete. Eulogio, who Wieslaw Wardzala testified was the man he dealt with at Illinois Concrete, testified that the only materials that he knew about that were ordered from plaintiff were two generators and claimed Budz placed the two generators on Eulogio's pickup truck and instructed Eulogio to sell them. Eulogio testified that he sold the generators on eBay through his Midwest company and kept some of the money because Illinois Concrete owed it to him. Budz testified that he had nothing to do with the sale of generators, did not ask Eulogio to sell them, and had no connection to Midwest. As to the purchase of the Mack tractor trailer, Budz was unaware of the check written for Illinois Concrete for its purchase, but testified that he agreed that Eulogio and he would purchase one together as long as Eulogio would finance it and that Budz would pay his half monthly. Budz never heard any more about the purchase and assumed Eulogio purchased the vehicle for himself.

¶ 138　　　Budz also claimed that he did not know the purpose of the checks written to Miracle Investment for Ricardo Gutierrez, a mechanic for Illinois Concrete who worked at the 14th Street construction project. Budz testified that he did not authorize payments to Gema for rent to store

construction materials at 14th Street and claimed an oral agreement with Eulogio that Budz could store materials there without charge.

¶ 139    Budz initially testified that he had no relationship to Eulogio's Black Diamond Concrete company. He later testified that he performed some work on the Michigan project in excavating a pond, but he was unaware of a corporation formed for that purpose. He had an oral agreement with Eulogio that he would be a partner or be reimbursed the work he put into it.

¶ 140    Eulogio testified that the Lenox property was purchased in 2005. Initially, he and Budz planned that it would be a joint project, but Budz later backed out when they could not agree on the terms. Eulogio testified that this is why Budz's name appeared on the initial documents relating to the sale, but Gema was ultimately the buyer on the deed. Illinois Concrete was the general contractor at the Lenox property. Budz poured the foundation. Midwest was also involved in working on the Lenox project. Eulogio was in charge of that project and the project on 14th Street. Yet, checks were written on Illinois Concrete's bank account paying money to Eulogio.

¶ 141    Wieslaw Wardzala, the president of plaintiff, testified that plaintiff initially gave credit to Illinois Concrete based on a credit application in which Illinois Concrete provided the name of a company that extended it credit, which provided a good report. That company was J&J Express trucking company, owned by Gema Fleites's father. Later, when Illinois Concrete was not paying its bills in a timely manner, Wardzala again extended credit to Illinois Concrete because he was told by Eulogio and Ljubic that they had a big job at the Rivers Casino. Budz testified that they did no work for Rivers Casino, yet Ljubic ordered light fixtures, which were delivered to the Rivers Casino. It is obvious that, at that time, Budz was not part of the company and the company was being operated by Eulogio.

¶ 142        The undisputed evidence also showed that Eulogio Fleites was also known as Joe Fleites and was married to Gema Fleites and they operated Professional Insurance Services, Inc., and American Fire and Casualty, an unauthorized insurance company without a license to operate an insurance company. Eulogio also operated Midwest and Illinois Concrete with Karolina Ljubic and Budz. Miracle Investments, LLC, was initially set up as a corporate vehicle for Gema for holding title to real estate but developed into a contracting firm for Eulogio to divert funds from Illinois Concrete.

¶ 143        (4) NONPAYMENT OF DIVIDENDS, (5) INSOLVENCY OF THE DEBTOR CORPORATION AT THE TIME, (6) NONFUNCTIONING OF OTHER OFFICERS OR DIRECTORS, AND (7) ABSENCE OF CORPORATE RECORDS

¶ 144        There is no evidence of dividend payments by Illinois Concrete. In fact, the bank records demonstrated that only three checks for less than $1500 were paid to Budz. It is undisputed that Illinois Concrete was insolvent and undisputed that Budz was a nonfunctioning officer. He never even looked at the books of the company or the funds that were transferred out of the company, based on his own testimony. It is further undisputed that there was an absence of computer records to show where the majority of corporate monies went or what they were for.

¶ 145        (8) COMMINGLING OF FUNDS AND (9) DIVERSION OF ASSETS FROM ILLINOIS CONCRETE TO THE FLEITESES AND THEIR ENTITIES TO THE DETRIMENT OF CREDITORS

¶ 146        The evidence in this case showed an abundance of commingling of Illinois Concrete funds with the company's control by the Fleiteses, and the diversion of assets between Eulogio and Gema Fleites and their entities PISI, American Fire, Midwest, and Miracle Investments, LLC. The trial court and the majority totally disregarded the testimony of the forensic

accountant, Michael Pakter, who opined that Illinois Concrete, Midwest, PISI, American Fire, and ABR are all related entities and are part of a single enterprise operated for the benefit of the Fleiteses to the detriment of plaintiff. Based upon his tracing of funds, Pakter found indicia of the entities commingling funds, paying for each other's expenses, and providing goods and services which were not paid for. With the exception of PISI, the individual entities, Illinois Concrete, Midwest, and American Fire commingled funds among the various entities, lacked individual capitalization, assets, or revenues, and lacked solvency.

¶ 147        Among the vast commingling that transpired for the benefit of Eulogio Fleites or his entities were the following:

1. $22,000 paid to ABR, one of Eulogio's companies, without explanation.

2. Over $100,000 of ABR's American Express bills paid without explanation.

3. $4000 transferred to Miracle Investments without explanation.

4. $77,987 transferred to Eulogio.

5. Eulogio obtained $58,000 from Illinois Concrete's bank account using a withdrawal slip without explanation.

6. Over $35,000 transferred to American Fire without explanation.

7. $20,000 to American Fire for "loan reimbursement," yet the books and records show that no such loan was received and Budz testified that his signature on the check was a forgery and not authorized.

8. $5000 check to Eulogio for the "McHenry Project" and $5000 to Eulogio for the Deming project, yet Budz did not recall any such projects.

9. $2400 check to Eulogio for Art Masonry, which Budz could not recall.

10. $10,000 check to the City of Chicago for an American Fire bill regarding the Lenox property, which had nothing to do with Illinois Concrete.

11. $6500 check for a Ford Escape for Eulogio.

12. $14,000 unexplained check for "Sharklins reimbursement."

13. $8100 check to Eulogio or cash.

14. Numerous unexplained checks for the Lenox property or the 14th Street project, which Budz had no knowledge of.

15. $15,350 check for a tractor trailer Mack truck titled to Eulogio's corporation, "Black Diamond Concrete."

16. $10,000 check for the Princess Foods project, in which Illinois Concrete had no involvement.

17. Eulogio stored supplies he purchased from plaintiff on his storage lot in Evanston, together with other materials and supplies purchased from other creditors in the name of Illinois Concrete. An example of this illegal practice was the masonry construction materials Eulogio purchased from Illinois Brick in the name of Illinois Concrete found on the lot.

¶ 148    (10) FAILURE TO MAINTAIN AN ARM'S-LENGTH RELATIONSHIP AMONG RELATED ENTITIES

¶ 149    The evidence in the case at bar showed that there was no arm's-length relationship among any of the entities controlled by the Fleiteses. It made no difference to Eulogio to deposit monies belonging to Illinois Concrete in his Midwest account, or take monies out of Illinois Concrete for fictitious jobs that Illinois Concrete had no involvement in. Eulogio set Budz up as his pawn while he controlled the company.

¶ 150    (11) ILLINOIS CONCRETE WAS A MERE FAÇADE FOR EULOGIO AND GEMA

¶ 151    The trial court and the majority found that Illinois Concrete was only a company that came upon hard times and was unable to meet its financial obligations. I find that the evidence shows that this was a fraudulent scheme designed by the Fleiteses for their benefit to defraud creditors and that Illinois Concrete was a mere façade for Eulogio and Gema Fleites and their entities.

¶ 152    Additionally, circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances. All of the evidence in the case at bar shows that the Fleiteses took out substantial assets in the form of cash from Illinois Concrete and then ordered electrical and other supplies from plaintiff when they knew that the goods could never be paid for. Between December 7, 2010, and January 17, 2011, Illinois Concrete purchased $389,712.04 worth of electrical supplies on credit with little or no money in its checking account, which was drained by Eulogio based primarily on fictious jobs that Illinois Concrete was not involved in. Budz was not with Illinois Concrete during this period of time and did not want to be part of what the Fleiteses were doing. As a result, Budz never made any claim that Eulogio embezzled from Illinois Concrete. To allow the Fleiteses to be absolved of responsibility would be wrong. Eulogio used Budz as his pawn and his wife Gema participated in the process. It would only be fair and just to pierce the corporate veil and enter judgment against Eulogio and Gema Fleites, PISI, and Midwest Supplies, Inc. The decision of the trial court and the majority is unreasonable, arbitrary, and not based on the evidence in this case and must be reversed. *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001).